UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

RICARDO McCLOUD,                    :
             Plaintiff,          :
                             :
           v.                  :          No. 5:25-cv-02119
                             :
READING SCHOOL DISTRICT,            :
             Defendant.          :

_____

**O P I N I O N**
**Defendant's Motion to Dismiss Amended Complaint, ECF No. 13 – Granted**

**Joseph F. Leeson, Jr.**                                    **October 7, 2025**
**United States District Judge**

## I.    INTRODUCTION

Plaintiff Ricardo McCloud, a diabetic adult, filed the instant suit against his former

employer, Reading School District, after he was terminated from his position as a school security

officer. In his Amended Complaint, McCloud alleges that he has suffered constitutional

deprivations, retaliation, and discrimination as a result of the district's actions. Defendant

Reading School District now moves to dismiss the Amended Complaint in its entirety. For the

following reasons, the Court will grant the motion without prejudice.

## II.    BACKGROUND

### A.  Factual Allegations

In early March of 2022, Plaintiff Ricardo McCloud was hired as a school security officer

by Defendant Reading School District ("Reading"), a public school system located in Reading,

Pennsylvania. Am. Compl. ¶¶ 4-8, 13. McCloud has diabetes and must eat periodically

throughout his work day to regulate his sugar levels. Reading was aware of McCloud's medical

condition and originally permitted McCloud to eat during the work day. *Id.* at ¶¶ 8-9.

### i.  McCloud's Placement at Reading Senior High School

McCloud was initially assigned to work at the Reading Senior High School. *Id.* at ¶ 13. While there, he was the only officer assigned to conduct security checks at an entrance by the auditorium door. *Id.* at ¶ 16. McCloud recalls receiving "derogatory looks" from the lead security officer, "insinuating that he was slow." *Id.* at ¶ 16. McCloud believes his work performance was compared to that of the security checkpoint at the school's main entrance, which was manned by two security guards. *Id.* at ¶ 16. In October 2023, McCloud requested a transfer and began work at Northwest Middle School, also in Reading School District. *Id.* at ¶¶ 16-17.

### ii.  McCloud's Placement at Northwest Middle School

At Northwest, McCloud was assigned to conduct security checks at the auditorium entrance door, which is regarded as a high-traffic entrance for student arrivals. *Id.* at ¶ 18. Again, McCloud was stationed alone at this school entrance. *Id.* at ¶ 19. McCloud recalls overhearing several negative comments from his colleagues regarding his performance as a security officer, such as "radio chatter" in which the middle school principal allegedly made "criticisms of him and his performance," and "snide comments" by fellow security officers, including a bet of "$50.00 on who could survive working at [the auditorium] door." *Id.* at ¶ 20. McCloud alleges that a high number of security risks present at the auditorium entrance where he was stationed, and "no other school security officer wanted to work the auditorium door." *Id.* at ¶¶ 19, 21-22.

### a.  No-Eating Mandate

On October 25, 2024, McCloud received a text from Security Lead, Rachel Abdallah, which read, "Effective immediately, there will be no eating on the floor or lobby, even if we are short. It has to be figured out. Do not snack . . . [d]oing so will result in [d]iscipline." *Id.* at ¶ 23. This text was sent to all security officers, asking that each respond to confirm receipt. *Id.*

McCloud replied, saying, "That's nice, my sugar is crashing." *Id.* at ¶ 24. In response, Abdallah instructed McCloud to "[s]tep into a room and take a break." *Id.* at ¶¶ 24-25. McCloud then met privately with Abdallah and explained his need to eat periodically during his shift. *See id.* at ¶ 26. Abdallah instructed McCloud to seek medical leave under the Family and Medical Leave Act (FMLA). *Id.* McCloud invoked FMLA leave and remained off duty for approximately two hours, during which time he alleges he was "recover[ing] from a diabetic episode." *Id.* at ¶¶ 27-28.

### b.  Surveillance of Work Performance

McCloud alleges that, following his exercise of FMLA leave, he was subjected to targeted surveillance by Security Lead Rachel Abdallah and School Police Officer Ruben Rodriguez. *See id.* at ¶ 30. On at least one occasion, Abdallah—whose duties encompassed oversight across multiple schools—visited Northwest Middle School "to find out if [McCloud] was late." *Id.* at ¶ 29. While on-site, Abdallah and Rodriguez entered the building and positioned themselves in a room with the door ajar, to discreetly "watch the security officers." *Id.* at ¶ 30. On December 10, 2024, McCloud received a formal reprimand for sipping tea while doing his standard walk through the school building, an activity that he alleges "could [only] have been observed . . . through the cracked door." *Id.* at ¶ 34. He later received a second write-up for allegedly recording video footage while on duty. *See id.* at ¶ 35. Both disciplinary actions were later rescinded. *See id.* at ¶¶ 34-36.

### c.  McCloud's Physical Altercation, Investigation, and Termination

On December 6, 2024, McCloud got into a physical altercation with a student's parent on school grounds. *See id.* at ¶ 37. McCloud alleges that the parent struck him first and did not stop when asked to, prompting McCloud to retreat while deflecting additional blows. *Id.* McCloud then "grabbed" the parent before "immediately releas[ing]" her. *Id.* McCloud alleges that his

conduct was consistent with his November 2023 security training, during which he was instructed by the Reading School District's Director of Security to "defend [him]self" should "someone from outside attack[]." *Id.* at ¶ 32 (capitalization omitted). McCloud chose not to report the incident because "[t]he entire interaction occurred over a period of about 6 seconds," and he knew that reporting it might subject the parent to a substantial fine. *See id.* at ¶ 37.

On December 9, 2024, the parent involved in the physical altercation told Officer Rodriguez that she "was choked by one of the officers at Northwest." *See id.* at ¶ 38. On or around December 10, 2024, Rodriguez informed Abdullah of the same. McCloud was then advised by his union representative to file a report about the altercation. *Id.* at ¶ 41-42. Soon after, an official investigation commenced regarding McCloud's conduct. *See id.* at ¶ 43. McCloud was told that he would have an opportunity to share his version of the events at an upcoming fact-finding conference. *See id.* at ¶¶ 43-44. McCloud alleges that he was "precluded from submitting any evidence" at the conference. *Id.* at ¶ 45. Shortly after the conference, Security Director Carl Britt "confronted [McCloud] and ushered him out of the building." *Id.* at ¶ 46(A). McCloud was told that he "would be contacted by email that week" regarding the fact finding, at which point he would be able to tell his version of events. *Id.* The following day, McCloud's employment at Northwest Middle School came to an end.[1] *Id.* at ¶ 46(D)-(F).

---

[1]    Though it is unclear whether McCloud's termination was a standard firing or a coerced resignation—because McCloud uses language which suggests both, *see* Am. Compl. ¶ 46(D) ("Plaintiff was fired the next day."); *but see id.* at ¶ 48 ("The next day, Christine McDougal forced Plaintiff to quit."); *see also id.* at ¶ 61 ("Plaintiff was told at a meeting by Director of Personnel Christina McDougal that if he would voluntarily resign [from] the Reading School District, Defendant would not object to him receiving unemployment compensation.")—the Court interprets this to be an allegation of either forced resignation or constructive termination. Notably, the Amended Complaint also says that "at the time of his termination, [McCloud] was on Family and Medical Leave Act leave approved by his employer, Defendant Reading School District." *Id.* at ¶ 7. Yet the allegations that he was quickly ushered out of the building after his superiors learned of his altercation with a parent, *id.* at ¶ 46, and that he was "coerced" to resign soon after, *id.* at ¶ 61, appear to contradict this statement. It is unknown whether McCloud requested FMLA leave in the days leading up to his employment termination. The only other allegation regarding FMLA leave is McCloud's two-hour FMLA leave taken on or around October 25, 2024. *Id.* at ¶¶ 27-28.

McCloud alleges that Director of Personnel Christine McDougal told McCloud that "if he would voluntarily resign [from] the Reading School District," the school "would not object to him receiving unemployment compensation." *Id.* at ¶ 61(A). Union Representative David Britt urged McCloud to accept the agreement and resign. *Id.* at ¶ 64. McCloud alleges that he "felt he had no choice and was being coerced to accept." *Id.* at 48.

McCloud alleges that in late December 2024, the school initiated formal criminal charges against him in connection with the December 6 physical altercation. *See id.* at ¶ 68. McCloud alleges that a hearing on the charges was held on March 3, 2025,[2] during which security footage of the incident was presented, and McCloud was found "not guilty" on the basis that he "was merely defending himself in response to [the parent's] actions." *Id.* at ¶ 69.

### B. Procedural History

---

[2]    McCloud alleges that Reading "pressed charges of assault and/or harassment" against him because of his altercation with a parent on December 6, 2024, *id.* at ¶ 68, but that such charges were resolved in a March 3, 2025, hearing presided over by "the Honorable Alvin Robinson," wherein McCloud was found "not guilty" and the parent was found "guilty," *id.* at ¶ 69. The Court is unaware of a state court case in which Reading School District, or the Commonwealth, by extension, pressed criminal charges against *both* the school security officer and the parent with whom he had an altercation. The Court is similarly unaware of any state court proceeding involving McCloud, and finds no such hearing in the public record (unless expunged); instead, it notes public record of a court hearing presided over by the Honorable Alvin B. Robinson, Berks County Magisterial District Judge, on March 3, 2025, in which the *parent* described by McCloud in his Amended Complaint was adjudged guilty of the summary offense of harassment, under 18 Pa.C.S. § 2709. *Cmmw. v. Perez*, No. MJ-23105-NT-0000526-2024, (Magisterial District Judge 23-01-05, filed Dec. 30, 2024). (Though, notably, the offense date listed for the conduct leading to this charge is December 27, 2024, *not* December 6, 2024, the date of the alleged altercation). *See id.* Thus, to the extent McCloud alleges that he was adjudged "not guilty" of the summary offense of harassment, namely by Berks County Magisterial District Judge Robinson in March of 2025, the Court cannot verify this fact in the public record. *See* 42 Pa.C.S. § 1515(a) (indicating that magisterial district judges have jurisdiction over summary offenses); 18 Pa.C.S. § 2709(c) (defining harassment as a summary offense). To the extent McCloud alleges that he was found "not guilty" of an assault charge on the same date by the same Magisterial District Judge, that is highly unlikely; assault is not a summary offense and would not have been decided via a summary trial. *See* 42 Pa.C.S. § 1515(a) (indicating that magisterial district judges have jurisdiction over "(1) [s]ummary offenses . . . (2) [m]atters arising under . . . The Landlord and Tenant Act of 1951 . . . (3) [c]ivil claims . . . (4) [hearings] [a]s commissioners to preside at arraignments, fix and accept bail . . . [and] (5) [o]ffenses . . . relating to driving under influence of alcohol or controlled substance."); 18 Pa.C.S. § 2701(b) (defining simple assault as a criminal misdemeanor of the third degree). *Compare* 18 Pa. S.C. § 106(b)(8)-(9) ("A crime is a misdemeanor of the third degree if it is so designated in this title or if a person convicted thereof may be sentenced to a term of imprisonment, the maximum of which is not more than one year," or if the misdemeanor is "without specification of degree."), *with id.* at § 106(c) ("An offense[] constitutes a summary offense if: (1) it is so designated in this title, or in a statute other than this title; or (2) if a person convicted thereof may be sentenced to a term of imprisonment . . . not more than 90 days.").

On April 28, 2025, McCloud initiated this action by filing a Complaint in this Court against Reading School District. *See* ECF No. 1. On June 3, 2025, Reading filed its first Motion to Dismiss under Fed. R. Civ. P. 12(b)(6). *See* ECF No. 8. On June 24, 2025, McCloud filed an Amended Complaint, *see* ECF No. 12, and the Court dismissed the first Motion to Dismiss as moot, *see* ECF No. 11. On July 8, 2025, Reading filed a Motion to Dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6). *See* ECF No. 13; *see also* Brief in Support ("Def. Br."), ECF No. 13-1. This Court extended McCloud's response deadline to July 28, 2025, per joint stipulation by the parties. *See* ECF No. 15. McCloud timely filed his response on that date. *See* Brief in Opposition ("Pl. Br."), ECF No. 16. Reading filed a Reply in support of its Motion to Dismiss the Amended Complaint on August 4, 2025. *See* ECF No. 17. The Court is now ready to render a decision on the Motion, ECF No. 13.

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss under Rule 12(b)(6) – Review of Applicable Law

Under Rule 12(b)(6), the court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted). Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678-79 (further explaining that determining

"whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Also, "a document integral to or explicitly relied upon in the complaint may be considered." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations and italicization omitted). The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

**B.      42 U.S.C. § 1983 Claims – Review of Applicable Law**

42 U.S.C. § 1983 is the vehicle by which federal constitutional claims may be brought in federal court. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Additionally, a "defendant in a civil rights action must have personal involvement in the alleged wrongs." *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Moreover, "[b]ecause vicarious liability is inapplicable to … § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

"In actions under 42 U.S.C. § 1983, federal courts apply the state's statute of limitations for personal injury." *Sameric Corp v. City of Phila.*, 142 F.3d 582, 599 (3d Cir. 1998). The

statute of limitations for personal injury actions in Pennsylvania is two years. *See id*.; 42 Pa.C.S. § 5524. "A section 1983 cause of action accrues when the plaintiff knew or should have known of the injury upon which its action is based." *Sameric Corp*., 142 F.3d at 599. "Rule 15(c) can ameliorate the running of the statute of limitations on a claim by making the amended claim relate back to the original, timely filed complaint." *Singletary v. Pa. Dep't of Corr*., 266 F.3d 186, 193 (3d Cir. 2001). The Rule provides: an "amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "The rationale of Rule 15(c) is that a party who has not been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984).

### C.    Discrimination

#### i.    Discrimination under the Americans with Disabilities Act (ADA) – Review of Applicable Law

"No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). An "employer" is defined as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year...." 42 U.S.C. § 12111(5)(A). Claims of discrimination under the ADA are analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411

U.S. 792 (1973). *See Cassidy v. Halyard Health, Inc.*, 391 F. Supp. 3d 474, 480 (E.D. Pa. 2019). To state a prima facie case of discrimination under the ADA,[3] a plaintiff must also show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs.*, 134 F.3d 576, 580 (3d Cir. 1998). "Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *See Stouch v. Township of Irvington*, 354 F. App'x 660, 666 (3d Cir. 2009) (citing *McDonnell Douglas*, 411 U.S. at 802-05). "The plaintiff then bears the burden of establishing that this proffered reason is a pretext for discrimination." *See id.*

The ADA defines "disability" as either (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1).[4] "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

---

[3]     In cases where "direct evidence of discrimination is discovered," a "plaintiff does not need to affirmatively plead all of the prima facie elements of a discrimination claim" to survive a motion to dismiss, because "the plaintiff might not need to prove each of those elements at trial." *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 136 (E.D. Pa. 2020) (citing *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002). In that instance, "to survive a motion to dismiss, a discrimination plaintiff needs only to allege 'enough facts to raise a reasonable expectation that discovery will reveal evidence of [the claim's] necessary element[s].'" *Id.* (citing *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016)).

[4]     Technically, this citation refers to The ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (as codified in provisions of 42 U.S.C. §§ 12101 *et seq.*), which became effective as of January 1, 2009. Any references herein to 42 U.S.C. § 12101, 12102, or its later subsections may use the acronym "ADA" rather than "ADAAA," but nonetheless refer to the post-amendment statute in place since 2009. *See* 42 U.S.C. § 12102(4) ("Rules of construction regarding the definition of disability").

### ii. Discrimination under the Rehabilitation Act of 1973, Section 504 – Review of Applicable Law

Section 504 of the Rehabilitation Act of 1973 ("RA") provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). "Section 504 of the [RA] and Title II of the ADA offer similar protections for persons with disabilities. Although Title II applies to all state and municipal governments, § 504 applies only to those agencies or departments receiving federal funds, and[] only [while] the funds are accepted." *Koslow v. Pennsylvania*, 302 F.3d 161, 166 n.3 (3d Cir. 2002). "The elements of a claim under the RA are the same [as those under the ADA], except that the plaintiff must also show that the program in question received federal dollars." *Durham v. Kelley*, 82 F.4th 217, 225 (3d Cir. 2023) (citing *Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021)). The other notable difference between these two statutory provisions relates to the causal link requirement. Section 504 of the RA requires that the "sole reason" for the discrimination be the disability, while the ADA requires only but-for causation. *See New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007). "However, a plaintiff bringing a Rehabilitation Act claim need not allege that [his] disability was the sole motivation for the policy or action that ultimately excluded [him] from receiving benefits." *See Smith v. Twp. of Warren*, No. 14-7178-BRM-LHG, 2016 WL 7409952, at *11 (D.N.J. Dec. 22, 2016) (citing *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1384 (3d Cir. 1991)). Rather, a plaintiff may satisfy the causation element by alleging that he was excluded from the benefits of the program because he was unable to access and/or utilize the benefits solely due to his disability. *See id.*

### iii. Discrimination and Disparate Treatment under Title VII of the Civil Rights Act – Review of Applicable Law

Federal law prohibits employment discrimination based on race, color, religion, sex, national origin, age, and disability. *See E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 448-49 (3d Cir. 2015). Disparate treatment claims brought under Title VII are analyzed using the three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Rabinowitz v. AmeriGas Partners, L.P.*, 252 F. App'x 524, 527 (3d Cir. 2007). "Under the *McDonnell Douglas* paradigm, an employee must first establish a prima facie case of discrimination, after which the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision." *Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005). "If the employer articulates one or more such reasons, the aggrieved employee must then proffer evidence that is sufficient to allow a reasonable finder of fact to find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual." *Id.* The Third Circuit Court of Appeals has "defined 'an adverse employment action' under Title VII as an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)). "It is important to note that although the burden of production may shift during the McDonnell Douglas inquiry, the ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the [employee] remains at all times with the [employee]." *Maldonado v. City of Allentown*, No. 5:25-cv-1673, 2025 WL 2467682, at *3 (E.D. Pa. Aug. 27, 2025); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (explaining that once the plaintiff establishes a prima facie case, the law creates a "presumption" of unlawful discrimination, which is rebutted if the employer articulates a legitimate nondiscriminatory explanation for the employer's action, but the

"presumption does not shift the burden of proof," and "the Title VII plaintiff at all times bears the ultimate burden of persuasion").

### iv. Hostile Work Environment under the ADA or PHRA – Review of Applicable Law

To state a prima facie claim for hostile work environment under the ADA or PHRA, a plaintiff must allege that:

> (1) [s/he] is a qualified individual with a disability under the ADA, (2) [s/he] was subject to unwelcome harassment, (3) the harassment was based on [his/her] disability or request for an accommodation, (4) the harassment was sufficiently severe or pervasive to alter the conditions of [his/her] employment and create an abusive working environment, and (5) the employer knew or should have known of the harassment and failed to take prompt, effective remedial action.

*Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 515-16 (E.D. Pa. 2012) (citing *Lowenstein v. Catholic Health East*, 820 F. Supp. 2d 639, 646–47 (E.D. Pa. 2011) (citing *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir.1999))). To determine whether the harassment was "severe or pervasive" a court "must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hanafy v. Hill Int'l, Inc.*, 669 F. Supp. 3d 419, 440 (E.D. Pa. 2023) (quoting *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 132 (E.D. Pa. 2020) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (internal quotations and brackets omitted))). A plaintiff must also show that the work environment in question is "objectively" hostile. *Walton*, 168 F.3d at 667 (referencing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, (1993)). "Workplace conduct must be viewed in its entirety, but isolated incidents do not

amount to discriminatory changes in the conditions of employment." *Douglas v. Kensington Cmty. Corp. for Individual Dignity*, 775 F. Supp. 3d 881, 898 (E.D. Pa. 2025) (citing *Clark Cnty. Sch. Dist.*, 532 U.S. at 270-71).

> ### v. Discrimination under Pennsylvania Human Relations Act (PHRA), 43 P.S. § 1423 – Review of Applicable Law

The legal standards governing the ADA claim apply equally to a disability discrimination claim under the PHRA. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (finding that the district court properly treated the plaintiff's PHRA claims as coextensive with his ADA claim).

## IV.   DISCUSSION

### A.  Section 1983

Counts I and II of the Amended Complaint appear to be brought under 42 U.S.C. § 1983, only. *See* Am. Compl. ¶¶ 72-85. Yet, "[s]ection 1983 is not itself a source of individual rights; rather, it provides a remedy for the violation of an individual right grounded in some independent source of federal law." *Rivera v. Edwards*, No. 23-1286, 2023 WL 8058753, at *2 (3d Cir. Nov. 21, 2023); *see also McLaine v. Lackawanna Cnty.*, 30 F. Supp. 3d 316, 320 (M.D. Pa. 2014) ("Section 1983 is not an independent source of substantive rights, but merely provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws.") (internal citations omitted). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West*, 487 U.S. at 48. Here, McCloud alleges that Reading was "at all times relevant to this action . . . acting under color of state law," Am. Compl. ¶ 74, so the Court will shift to consider whether McCloud has alleged a constitutional deprivation.

Count I of the Amended Complaint states that McCloud was "deprived . . . of his property without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States." *Id.* at ¶ 75. Yet, what this property was (and how McCloud was deprived of it) is less than clear. McCloud alleges that such deprivation occurred as a result of Reading acting according to "its policy, custom and practice," *id.*, as a result of Reading "fail[ing] to adopt clear, lawful policies," and as a result of Reading "fail[ing] to train its deputies as to the role of its officers in employment disputes," *id.* at ¶¶ 77-78, all of which relate to different factual scenarios from McCloud's employment.[5]

Counts I and II do not describe the alleged "policy or custom" that existed during McCloud's employment, and the Court's review of the Amended Complaint finds only one clear allegation of a directive implemented by an employee of Reading: the no-eating mandate issued by McCloud's Security Lead on October 25, 2024. *Id.* at ¶ 23. McCloud does not specify, however, what "property" he was deprived of as a result of this mandate. McCloud does not allege that his superiors confiscated his snacks or any other "personal property," only that they asked him to either refrain from snacking while on duty, to "[s]tep into a room and take a break," or to take FMLA leave if he could not comply with the prior two instructions. *See id.* at ¶¶ 23-28. To the extent McCloud alleges a property deprivation as a result of this work mandate, he has alleged insufficient facts in support of this. *See Phillips*, 515 F.3d at 234 (finding that a plaintiff has stated a plausible claim only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'") (quoting *Twombly*, 550 U.S. at 555).

---

[5]      To the extent McCloud intended the Court to interpret these allegations as separate claims for municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), they are not pleaded accordingly.

Insofar as McCloud alleges an unspecified constitutional deprivation as a result of Reading's "fail[ure] to adopt clear, lawful policies," Am. Compl. ¶ 77, the Supreme Court "recognized in *Monell* and ha[s] repeatedly reaffirmed [that] Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 415 (1997). Thus, an allegation that Reading failed to adopt a policy is insufficient to state a claim for a constitutional deprivation resulting from Reading's deliberate action.

Lastly, McCloud alleges an unspecified constitutional deprivation resulting from Reading's "failure to train its deputies as to the role of its officers in employment disputes," Am. Compl. at ¶¶ 77-78, seemingly referring to the employment dispute regarding his need to eat on the job, *id.* at ¶¶ 23-28, or the employment dispute resulting from his physical altercation with a parent, *id.* at ¶ 37. To the extent McCloud alleges that his resultant FMLA leave or his ultimate termination from employment constituted a property deprivation, "this Court is obligated to reiterate that," regardless of whether McCloud intended to claim a violation of his substantive or procedural due process rights, "'public employment is not a fundamental property interest protected by substantive due process,'" *Errington v. City of Reading*, No. 5:24-cv-3009, 2025 WL 209183, at *12 n.14 (E.D. Pa. Jan. 15, 2025) (citing *Dondero v. Lower Milford Township*, 431 F. Supp. 3d 590, 602 (E.D. Pa. 2019) (citing *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 142-43 (3d Cir. 2000))), and public "at-will employment is not generally considered a property interest" protected by procedural due process. *Wilson v. MVM*, Inc., 475 F.3d 166, 177 (3d Cir. 2007) (citing *Thomas v. Hammonton*, 351 F.3d 108, 113 (3d Cir. 2003)). The exception to this general rule says that "to bring a claim for violation of procedural due process based on discharge from a job, a claimant must prove that he had a constitutionally protected property

right in continued employment," *id.* (citing *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 538 (1985)), or a "legitimate entitlement to such continued employment," *id.* (citing *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972))), as supported by, *e.g.*, the existence of an "employment contract [containing] a 'just cause' provision," *id.* (citing *Kelly v. Sayreville*, 107 F.3d 1073, 1077 (3d Cir. 1997)). Here, McCloud makes no such factual allegations. Instead, the Amended Complaint claims that Reading "violated [McCloud's] rights to Due Process under the 14th Amendment" by refusing to give him an opportunity to present evidence at the fact-finding conference concerning his altercation with a parent. Am. Compl. ¶¶ 47, 49, 63. This allegation has nothing to do with any "policy," "custom," or "failure to train" which in Count I he alleges led to a violation of his due process rights. Moreover, McCloud has provided nothing to support the idea that he would have had a *property* interest in speaking at a conference. Overall, his claim that he was deprived of a property interest under the Due Process Clause of the Fourteenth Amendment stands alone in Count I and remains unsupported throughout the Amended Complaint.

Count II, by comparison, does not allege a constitutional deprivation at all, and does not cite to a legal basis for relief other than section 1983. It restates the allegations that Reading either implemented, or failed to adopt, clear policies and customs, and/or that Reading failed to train or supervise its employees with respect to the handling of employment disputes; it adds the allegation that Reading, "[i]n retaliation for [McCloud's] efforts to exercise his constitutional rights . . . sought to institute criminal proceedings" against him, *id.* at ¶ 81, but does not clarify what protected activity McCloud had engaged in, let alone state a legal basis for a retaliation claim.[6] Without alleging a basis for relief, Count II fails to allege a claim under federal law.

---

[6]    The Amended Complaint does not make clear whether McCloud intends to assert a retaliation claim under the First Amendment, Title VII, ADA, PHRA, or some other basis in law. "Under Federal Rule of Civil Procedure

Moreover, without sufficient factual allegations in support of the assertion that he suffered a constitutional deprivation, McCloud has failed to state a plausible claim grounded in federal law, pursuant to section 1983, in either Count I or II.[7]

Both Counts I and II will be dismissed without prejudice and with leave to amend. *See Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004) ("Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility."), *abrogated on*

---

8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). The Court Rule 8's pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

[7]     The Court stresses that it is not obligated to liberally construe a counseled and verified complaint in the way that it would a *pro se* complaint. *See Sell v. Barner*, 586 F. Supp. 319, 321 (E.D. Pa. 1984) ("It is axiomatic that a [section 1983] complaint must be pleaded with specificity sufficient to provide fair notice to defendants of the substance of plaintiff's claims and the grounds upon which they rest. . . . Moreover, these pleading requirements will be strictly enforced where, as here, a plaintiff is represented by counsel.") (citing, in part, *United States v. City of Philadelphia*, 644 F.2d 187, 204 (3d Cir. 1980)). Still, Counts I and II of the Amended Complaint use language suggestive of an attempt to allege municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), and a retaliation claim, potentially under Title VII, ADA, or PHRA. As currently written, the Amended Complaint fails to state a claim grounded in either theory of liability.

McCloud makes conclusory statements that Reading adopted a "policy or custom" or "failed to train" its employees, *see* Am. Compl. ¶¶ 73-79, but does not specify *what* this policy or custom was, or *how* its failure to train employees lead to the violation of his rights under federal law. The Court reiterates that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Moreover, the Court emphasizes that *Monell* merely provides an avenue whereby a claimant may allege liability against a municipality, which "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Without also alleging that an identifiable actor—a known, municipal officer or employee with policymaking or decision-making authority—took *deliberate* action that deprived the claimant of his rights guaranteed under federal law, a claimant cannot rely on *Monell* as a basis for liability in and of itself. *See generally Lebie v. Borough*, No. 13-cv-6819, 2014 WL 2085518, at *2 (E.D. Pa. May 16, 2014).

To establish a prima facie case of retaliation under Title VII, the ADA, and/or the PHRA, "a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); *Boykins v. SEPTA*, No. 17-1980, 2018 WL 460652, at *2, *6 (3d Cir. 2018) (analyzing claims under Title VII and the PHRA the same). McCloud alleges only that Reading retaliated against his "efforts to exercise his constitutional rights," by "institut[ing] criminal proceedings" against him. Am. Compl. ¶ 81. Yet he does not clarify what constitutional rights he sought to exercise, or how this constitutes "protected activity," let alone allege facts in support of a causal connection to an adverse action by Reading.

Since the Court hereby dismisses Counts I and II without prejudice and with leave to amend, for failure to state a constitutional deprivation necessary to bring a claim pursuant to section 1983, the brief Fed. R. Civ. P. 12(b)(6) discussion above, regarding potential *Monell* and retaliation claims, does not factor into the decision reached by this opinion. The Court observes, however, that the same statements of the claims were made in the Amended Complaint as were made in the original Complaint. *See* Compl., ECF No. 1, ¶¶ 61-72; Am. Compl. ¶¶ 73-85. It therefore cautions that any amended pleading which follows this opinion must plead its counts and supporting facts with specificity, or risk dismissal with prejudice for failure to ameliorate these deficiencies.

*other grounds by Rivera v. Monko*, 37 F.4th 909 (3d Cir. 2022); *In re Burlington*, 114 F.3d at 1434 ("Federal Rule of Civil Procedure 15(a) provides that 'leave [to amend] shall be freely given when justice so requires.' . . . Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility.") (internal citations omitted).

### B. Discrimination under the Rehabilitation Act of 1973 (RA) and the Americans with Disabilities Act (ADA).

Count III of the Amended Complaint alleges disability discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "The elements of a claim under the RA are the same [as those under the ADA], except that the plaintiff must also show that the program in question received federal dollars." *Durham*, 82 F.4th at 225 (citing *Gibbs*, 989 F.3d at 229).

McCloud has already alleged that Reading, a public school district operating within the Commonwealth, receives federal funding. *See* Am. Compl. ¶ 90. Since the RA defines "program or activity" to include "local educational agenc[ies],"[8] *T.F. v. Fox Chapel Area Sch. Dist.*, 589 Fed. Appx. 594, 598 (3d Cir. 2014) (unpublished) (citing 29 U.S.C. § 794(b)(2)(B)), the Court finds this allegation sufficient. Nevertheless, to state a prima facie case of discrimination, McCloud also must allege that "(1) he is a disabled person within the meaning of the ADA; (2)

---

[8]    The term "local educational agency" is defined as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of . . . public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State. . . ." 20 U.S.C. § 7801(30); *see* 29 U.S.C. 794(b)(2)(B) ("'Program or activity' defined . . . means all of the operations of . . . a local educational agency (as defined in section 7801 or Title 20) . . . .").

he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul*, 134 F.3d at 580. Since the *McDonnell Douglas* "framework does not come into play at the motion to dismiss stage," *see Dreibelbis v. Cnty. of Berks*, 438 F. Supp. 3d 304, 313 (E.D. Pa. 2020), the Court need only determine whether McCloud's amended complaint states a plausible claim for disability discrimination.

### i. "Disabled person"

McCloud alleges that he qualifies as a person with a "disability" under the ADA and RA because he has Type I diabetes, a condition that requires him to eat periodically throughout each day to maintain his sugar levels. *See* Am. Compl. ¶¶ 8, 87, 89; Pl. Br. at 5, 12-13. The ADA defines "disability" as either (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1). Whether Type I diabetes is determined to be a "disability" under the ADA and RA therefore depends on whether and to what extent McCloud alleges facts in support of at least one of these categories.

### a. "Substantially limits one or more major life activities"

"[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "The determination of whether an individual is substantially limited in a major life activity must be made 'on a case-by-case basis.'" *Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163, 167 (3d Cir. 2015) (quoting *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999)). "The inability to perform a single, particular job does not constitute a substantial

limitation in the major life activity of working." *Walton*, 168 F.3d at 665 (referencing 29 C.F.R.

§ 1630.2). A plaintiff must plead an "important" limitation on major life activities, and must

plead "the degree of limitation caused by the impairment and the nature of the alleged

impairment at the time of his termination." *Koller*, 850 F. Supp. 2d at 513 (citing *Fleck v.

WILMAC Corp.*, No. 10–5562, 2011 WL 1899198, at *5 (E.D. Pa. May 19, 2011) ("The Court's

relevant determination ... is whether the plaintiff had a disability at the time of the adverse

employment decision.").

      Here, the Amended Complaint alleges "nothing more than [McCloud's] status as an

insulin-dependent diabetic. It includes no factual allegations of impairment or limits on major

life activities whatsoever"—only that he must periodically snack to regulate his sugar levels. *See

Eyajan v. Nesco Resource*, No. 1:18-cv-00222, 2019 WL 13261833, at *4 (W.D. Pa. July 23,

2019), *report and recommendation adopted*, No. 1:18-cv-00222, 2019 WL 13261832 (W.D. Pa.

Sept. 27, 2019). McCloud gives no indication that he was consistently limited by his diabetes, or

that it was an unmanageable condition. For years he was able to work as a school security officer

despite being diabetic, and when he was told he was no longer able to eat while on duty, he was

told to "[s]tep into a room and take a break," or to otherwise take sanctioned FMLA leave.

McCloud has not alleged facts illustrating that, despite these accommodations and his own

independent health management, his activities were still limited. *See Riley v. St. Mary Med. Ctr.*,

2014 U.S. Dist. LEXIS 57065, at *21 (E.D. Pa. Apr. 23, 2014) (dismissing the ADA claim

because the plaintiff "provided no facts illuminating to what extent or how her activities are

'limited'"); *but see Turner v. Cmmw. of Pennsylvania*, No. 07-273, 2009 WL 1858253, at *3

(W.D. Pa. June 29, 2009) (finding that, where plaintiff specifically alleged that her diabetes

limited her major life activities of eating, caring for one's self and metabolizing food, she had

sufficiently pleaded her disability). Simply put, alleging a history of diabetes, alone, is insufficient. *See Eyajan*, 2019 WL 13261833, at *4 (finding that "nothing in [the ADAAA] can be read to mean that a diagnosis of diabetes alone demonstrates a disability within the meaning of the ADA," and that "even after the passage of the ADAAA, courts have continued to recognize that a diagnosis of diabetes alone does not support a plaintiff's status as 'disabled.'"). McCloud's allegations "do not rise to the level of important, let alone, substantial limitations on a major life activity." *Koller*, 850 F. Supp. 2d at 513 (citing *Gray v. Walmart Stores, Inc.*, No. 10–171, 2011 WL 1831780, at *10 (E.D.N.C. May 12, 2011)). Consequently, McCloud "has failed to adequately plead the existence of an impairment that would rise to the level of 'substantially' limiting one or more of [his] major life activities." *Id.* at 514.

### b. "Record of impairment"

"'Record of impairment' claims protect individuals who suffer discriminatory actions based upon a documented history of disability, and a plaintiff relying upon a record of impairment must establish a history of a condition that substantially limits a major life activity." *Gardner v. SEPTA*, 410 F. Supp. 3d 723, 738 (E.D. Pa. 2019) (citing *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 436-37 (3d Cir. 2009)), *aff'd*, 824 F. App'x 100 (3d Cir. 2020). "To establish the existence of a disability based on a "record of such impairment" within the meaning of the ADA, McCloud would have to "provide evidence that [Reading] relied upon [his] record of impairment in making its employment decision." *Koller*, 850 F. Supp. 2d at 514 n.8 (citing *Mohney v. Pennsylvania*, 809 F. Supp. 2d 384, 401 (W.D. Pa. 2011) (citing *Eshelman*, 554 F.3d at 437)).

Here, McCloud has only alleged that Reading was aware of his diabetic condition, *see* Am. Compl. ¶¶ 8-9, 88, and that Reading "discriminated against [him] based upon his disability,

and, specifically, his need to eat snacks regularly," *id.* at ¶ 89. The latter statement is conclusory. McCloud has not specifically alleged that Reading made an adverse employment decision *because of* his record of having diabetes.[9] *See New Directions Treatment Servs.*, 490 F.3d at 300 n.4 (finding that Section 504 of the RA requires that the "sole reason" for the discrimination be the disability). Rather, McCloud's employment ended soon after Reading investigated his physical altercation with a parent. There is nothing in the record to suggest that Reading relied on McCloud's diabetic condition, rather than this altercation, in its employment actions preceding or concerning his termination. Even if it had, McCloud still has not alleged sufficient facts to suggest that he is substantially limited by his diabetes. *See* section IV(B)(i)(a), *supra*. Thus, he fails to allege a disability based on "record of impairment."

### c. "Regarded as having such an impairment"

An "individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). To prevail on a regarded-as claim, the "plaintiff would have to show that his employer misinterpreted information about his limitations to conclude that he was unable to perform a 'wide range or class of jobs.'" *Keyes v. Catholic Charities of the Archdiocese of Phila.*, 415 F. App'x 405, 410 (3d Cir. 2011). The "plaintiff must show that the employer believed that a major life activity was substantially limited by the plaintiff's impairment." *See Popko v. Penn State*

---

[9]    To the extent McCloud sought to show, but failed to specifically allege, that Reading took adverse action against him based in part on his temporary FMLA absence(s) from work, the Third Circuit Court of Appeals has determined that a "relatively short-term absence from work, without any long-term impairment, is generally held to be insufficient to create a record of disability." *Parrotta v. PECO Energy Co.*, 363 F. Supp. 3d 577, 594 (E.D. Pa. 2019) (citing *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 437 (3d Cir. 2009)).

*Milton S. Hershey Med. Ctr.*, No. 1:13-cv-01845, 2014 WL 3508077, at *6 (M.D. Pa. July 14, 2014). "Simply alleging that an employer knew about a disability is not sufficient to demonstrate that the employer regarded the employee as disabled." *Amoroso v. Bucks Cnty. Ct. of Common Pleas*, No. 13-0689, 2014 WL 1284791, at *8 (E.D. Pa. Mar. 27, 2014).

Here, McCloud has alleged only that Reading was aware of his diabetic condition, *see* Am. Compl. ¶¶ 8-9, 88, and that Reading "accommodated" him by allowing him to eat during his shift on prior occasions, *see id.* at ¶¶ 8, 88, and by encouraging him to take FMLA leave when needed, *see id.* at ¶ 26. McCloud does not allege that Reading believed his major life activities to be impacted by his diabetes, or that his employer regarded him as "disabled" and not just as a diabetic employee.[10] Without alleging facts in addition to Reading's knowledge of his condition, McCloud has failed to allege a "regarded as" disability under the ADA.

Without establishing either (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment," McCloud has failed to allege a disability pursuant to 42 U.S.C. § 12102(1). The Court need not address whether McCloud has also established that he was qualified to perform the essential functions of his job or that Reading took an adverse employment action against him. McCloud has failed to state a claim for disability discrimination under the ADA and RA, having alleged insufficient facts in support of a disability. Accordingly, Count III will be dismissed without prejudice and with leave to amend. *See Alston*, 363 F.3d at 236 ("Dismissal without leave to amend is justified only on the grounds

---

[10]    The Court does not read McCloud's allegation that "Defendant was on notice and fully aware of Plaintiff's disability" to demonstrate that Reading *regarded* McCloud as having a disability—merely that Reading was aware of McCloud's diabetic condition. *See* Am. Compl. ¶ 88. McCloud's conclusory allegation that "Plaintiff is disabled" because "[h]e is a diabetic," *id.* at ¶ 8, suggests that any reference to "Plaintiff's disability" in the Amended Complaint reflects McCloud's own classification of his condition, absent a prima facie showing of "disability" under the ADA.

of bad faith, undue delay, prejudice, or futility."); *In re Burlington*, 114 F.3d at 1434 ("Federal Rule of Civil Procedure 15(a) provides that 'leave [to amend] shall be freely given when justice so requires.' . . . Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility.") (internal citations omitted).

### C.  Other Forms of Discrimination not Pleaded

Uniquely, despite being explicitly brought under the RA, Count III also says that McCloud "suffers from diabetes, a qualifying disability under the . . . Pennsylvania Human Relations Act" (PHRA). Am. Compl. ¶ 87. This one paragraph in the Amended Complaint marks the only time that McCloud mentions the PHRA, other than in his Opposition Brief, where he quotes another order of this Court denying a motion for judgment on the pleadings in an unrelated case.[11] *See* Pl. Br. at 11-12, 17. McCloud also alludes to instances of race and age discrimination by Reading. *See* Am. Compl. ¶¶ 51, 53, 57 ("On information and belief, Plaintiff asserts that other African American employees of Defendant were terminated and subsequently either threatened with criminal prosecution or prosecuted and/or never provided any meaningful opportunity to defend themselves.") and ¶¶ 62, 66 (indicating that the resignation agreement proposed to McCloud was "invalid under the provisions of the Older Workers Benefits Protection Act, 29 U.S.C. § 626(f)," a provision or amendment to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*). Yet, McCloud provides no additional factual support for these cursory allegations, and fails to plead separate and clear causes of action under any of these theories of liability. Accordingly, the Court finds that he has failed to state a

---

[11]     Why McCloud repeatedly cites to this Court's March 14, 2025 Order in *Neiman v. Wyomissing Area School District and Robert Scoboria*, No: 5:24-cv-03797, is perplexing, particularly because that Order *denied* a *Plaintiff's* Motion for Partial *Judgment on the Pleadings*, in part because a dispute of fact existed as to whether Plaintiff had actually established a "disability" as defined under the ADA, PHRA, or Rehabilitation Act (RA). The *Neiman* matter is analogous to McCloud's only in that the plaintiffs in both made claims of discrimination and retaliation, but the *Neiman* Order McCloud cites to considers a different motion at a different stage of litigation and ultimately denied the plaintiff's requested relief.

claim for discrimination or disparate treatment under Title VII of the Civil Rights Act, the PHRA, the ADEA, or any other theory of discrimination not expressly mentioned.

### D. Hostile Work Environment

To state a prima facie claim for hostile work environment based on a disability, McCloud must allege that:

> (1) [he] is a qualified individual with a disability under the ADA, (2) [he] was subject to unwelcome harassment, (3) the harassment was based on [his/her] disability or request for an accommodation, (4) the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment, and (5) the employer knew or should have known of the harassment and failed to take prompt, effective remedial action.

*Koller*, 850 F. Supp. 2d at 515 (citing *Lowenstein*, 820 F. Supp. 2d at 646–47 (citing *Walton*, 168 F.3d at 667)).

Though McCloud has not separately pleaded a claim for hostile work environment, his Amended Complaint alleges that "Security Lead Abdullah made Northwest Middle School a hostile work environment for [McCloud]." Am. Compl. ¶ 30. McCloud recalls occasions where he overheard whispers and snide comments about his work performance from colleagues and supervisors, *id.* at ¶¶ 16, 19, 20, and one instance where Abdallah and Rodriguez entered the school building and proceeded to "watch the security officers," *id.* at ¶ 30, later issuing McCloud a formal reprimand for sipping tea while on duty, *id.* at ¶ 34, followed by another reprimand for recording video footage while on duty, *see id.* at ¶ 35. Yet, McCloud has not shown that Abdallah or Rodriguez engaged in this surveillance *because of* McCloud's diabetes, nor that the comments or reprimands he received (namely the one about recording video footage) were *on*

*account of* his diabetes. Without such a showing, this conduct cannot amount to a

"*discriminatorily* hostile work environment." *Mercer v. Se. Pennsylvania Transit Auth.*, 26 F.

Supp. 3d 432, 444 (E.D. Pa. 2014) (citing *Harris*, 510 U.S. at 21), *aff'd sub nom. Mercer v.*

*SEPTA*, 608 F. App'x 60 (3d Cir. 2015). This conduct was also not severe or pervasive because

McCloud only alleges one known instance of surveillance, and the resulting disciplinary actions

against him were later rescinded. *See* Am. Compl. ¶¶ 34-36. McCloud gives no indication that he

received further reprimands for eating or drinking while on duty—*i.e.*, the only activity he

engaged in at work that was attributed to his diabetes, and of which he informed his supervisors.

McCloud has accordingly failed to state a claim for hostile work environment under the ADA or

any other legal grounds.

## V.    CONCLUSION

McCloud has failed to allege facts in support of a constitutional deprivation as required to

bring a claim pursuant to 42 U.S.C. § 1983. He has also failed to allege facts to support the

assertion that his diabetes qualifies as a disability under the ADA, as required to state a claim for

disability discrimination under the RA or related statutes. Since the Amended Complaint brings

claims only under section 1983 and the RA, the Court will dismiss all claims without prejudice

and grant leave to file a second amended complaint that pleads McCloud's causes of action with

greater specificity. Reading's Motion to Dismiss McCloud's Amended Complaint is granted.

A separate order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge