UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

RICARDO McCLOUD,                                  :
　　　　　　　Plaintiff,                          :
                                                  :
　　　v.                                          :    No. 5:25-cv-2119
                                                  :
READING SCHOOL DISTRICT,                          :
　　　　　　　Defendant.                          :

_____

**O P I N I O N**
**Defendant's Reading School District's Motion to Dismiss Plaintiff's Third Amended**
**Complaint, ECF No. 30 – Granted**

**Joseph F. Leeson, Jr.**                                      **July 13, 2026**
**United States District Judge**

## I.　　INTRODUCTION

Plaintiff Ricardo McCloud, a diabetic adult, filed the instant suit against his former

employer, Reading School District, after he was terminated from his position as a school security

officer. In his now Third Amended Complaint, McCloud alleges that he has suffered

constitutional deprivations, retaliation, and discrimination as a result of the district's actions.

Defendant Reading School District moves to dismiss the Third Amended Complaint in its

entirety, pursuant to Fed. R. Civ. P. 12(b)(6). For the following reasons, the Court will grant the

motion with prejudice.

## II.　　BACKGROUND

### A.　Factual Allegations

In March of 2022, Defendant Reading School District ("Reading"), a public school

system located in Reading, Pennsylvania, hired Plaintiff Ricardo McCloud as a "School Safety

Officer" (*i.e.*, "security officer"). Third Am. Compl. ¶ 13, ECF No. 29. McCloud has Type I

diabetes, *see id.* at Ex. B, and must eat periodically throughout his workday to regulate his blood

sugar levels, *id.* at ¶ 12. McCloud alleges that if he does not "eat snacks and drinks during work he will black out or fall, or both." *Id.* at ¶ 28(B). Reading was aware of McCloud's medical condition and originally permitted him to eat and drink during the workday. *Id.* at ¶¶ 12(C)-(D).

### i.   McCloud's Placements at Reading School District

McCloud was initially assigned to work at Reading Senior High School. *Id.* at ¶ 13. McCloud recalls receiving "derogatory looks" from the lead security officer, "insinuating that he was slow." *Id.* at ¶ 16. In October 2023, McCloud requested a transfer out of Reading Senior High School and began work at Northwest Middle School ("Northwest"), also in the Reading School District. *Id.* at ¶ 17. At Northwest, he was assigned to conduct security checks at the auditorium entrance door, a high-traffic entrance for student arrivals. *Id.* at ¶ 18. McCloud recalls overhearing several negative comments from his colleagues regarding his performance, such as "radio chatter" in which the middle school principal allegedly made "criticisms of [him] and his performance," and "snide comments" by fellow security officers, including a bet of "$50.00 on whether he could survive working at [the auditorium] door." *Id.* at ¶ 21.

### ii.   No-Eating Mandate

On October 25, 2024, McCloud received a text from Security Lead Rachel Abdullah[1] that read: "Effective immediately, there will be no eating on the floor or lobby, even if we are short.

---

[1]      McCloud uses two different spellings for the Security Lead throughout his Third Amended Complaint: "Abdullah" and "Abdallah." Since "Abdullah" is used more often, the Court shall refer to her as Security Lead "Rachel Abdullah."

The Court also feels compelled to point out several unbecoming comments featured in McCloud's Third Amended Complaint. McCloud suggests that Security Lead Rachel Abdullah was at one point involved in a "pedophile ring"—an allegation seemingly irrelevant to McCloud's claims of disability discrimination and retaliation, the FMLA, or the PHRA. *See* Third Am. Compl. ¶ 25(B), ECF No. 29. Distressingly, McCloud also makes an unnecessary description of Abdullah as a "mulato" [sic], a word oft interpreted as an offensive racial slur with severely negative connotations. *See id.* at ¶ 25(A). If intended as such, the Court takes extreme issue with the manner in which McCloud, through his counsel, deigns to represent himself in this Court. Using one's pleadings to besmirch a former supervisor, rather than to bolster one's legal claims against their former employer, is a waste of Court resources and will not be tolerated. Counsel for the Plaintiff is advised to exercise caution and scrutiny when drafting and editing pleadings before they are submitted to this Court for review.

It has to be figured out. Do not snack . . . [d]oing so will result in [d]iscipline." *Id.* at ¶ 25(A). This text was sent to all security officers, asking that each respond to confirm receipt. *Id.* McCloud replied, "[t]hat's nice, my sugar is crashing." *Id.* at ¶ 26. In response, Abdullah instructed McCloud to "[s]tep into a room and take a break." *Id.* at ¶ 26. McCloud chose not to do so, on the belief that security officers were typically not allowed to enter classrooms and have no breakroom of their own; McCloud grew concerned that he was being "set up for a write-up." *Id.* at ¶ 27. McCloud then met privately with Abdullah and explained his need to eat periodically during his shift. *See id.* at ¶ 28(A). Abdullah instructed McCloud to seek medical leave under the Family and Medical Leave Act ("FMLA"). *Id.* McCloud invoked FMLA leave and remained off duty for approximately two hours, during which time he alleges he was "recover[ing] from a diabetic episode." *Id.* at ¶ 30.

### iii.  Surveillance of Work Performance

McCloud alleges that, around the time of his FMLA leave, he was subjected to targeted surveillance, "heightened scrutiny[,] and retaliatory discipline" by Abdullah and School Police Officer Ruben Rodriguez. *See id.* at ¶ 28(C), 29(B). On at least one occasion, Abdullah visited Northwest Middle School "to find out if [McCloud] was late." *Id.* at ¶ 31. While on-site, Abdullah and Rodriguez entered the building and positioned themselves in a room with the door ajar, to discreetly "watch the security officers." *Id.* at ¶ 32(A). On December 10, 2024, McCloud received a write-up for sipping tea while doing his standard walk through the school building, an activity that he alleges "could [only] have been observed . . . through the cracked door." *Id.* at ¶ 37. This write-up was later rescinded. *Id.* McCloud also received a second write-up for recording video footage while on duty. *See id.* at ¶ 38.

### iv. McCloud's Physical Altercation, Investigation, and Termination

On December 6, 2024, McCloud got into a physical altercation with a student's parent on school grounds. *See id*. at ¶ 40. McCloud alleges that the parent struck him first and did not stop when asked to, prompting McCloud to retreat while deflecting additional blows. *Id*. McCloud then "grabbed" the parent before "immediately releas[ing]" her. *Id*. McCloud alleges that his conduct was consistent with his November 2023 security training,[2] during which he was instructed by Reading's Director of Security, Carl Britt (hereinafter "Director Britt"), to "defend [him]self" should "someone from outside attack[]." *Id*. at ¶ 35 (capitalization omitted). McCloud chose not to report the incident because the entire interaction lasted "about 6 seconds," and he knew that reporting it might subject the parent to a substantial fine. *See id*. at ¶ 40(A).

On December 9, 2024, the parent involved in the physical altercation told Officer Rodriguez that she "was 'choked out' by one of the officers at Northwest." *See id*. at ¶ 41. On or around December 10, 2024, Rodriguez informed Abdullah of the same. *Id.* at ¶ 42. McCloud was then advised by his Union Representative, David Britt (hereinafter "Union Rep Britt") to file a report about the altercation. *Id.* at ¶ 44. Soon after, an official investigation commenced regarding McCloud's conduct. *See id*. at ¶ 46. McCloud was told by Union Rep Britt, and likewise by Director Britt, that he was entitled to write a report and present evidence in defense of himself and that he would have an opportunity to share his version of events at an upcoming fact-finding conference concerning the December 6th incident. *See id*. at ¶¶ 47, 79. McCloud alleges that "no factfinding conference occurred," *id.* at ¶ 46, and that he was "precluded from

---

[2] McCloud explains that such training was routine. *See* Third Am. Compl. ¶ 32(C) (explaining that pursuant to statute, school police officers and municipal police officers in Reading receive "919 hours of training" and education, "which covers 20 areas"); *id.* at ¶ 35(A) ("In November of 2024, all school security officers received training."); *id.* at ¶ 35(B) ("During Thanksgiving break in 2024, Carl Britt, the Director of Security for the entire School District, participated in training of security guards during which he instructed officers, including [McCloud].").

submitting any evidence" on his own behalf, *id*. at ¶ 48, including a written statement from Northwest Middle School Vice Principal, Dr. Smith, *see id.* at ¶ 39, which was "supportive of" McCloud, *id.* at ¶ 48. Later in the day on December 10, 2024, Director Britt "confronted [McCloud] and ushered him out of the building." *Id*. at ¶ 49(A). McCloud was told that he "would be contacted by email that week" regarding the fact finding, at which point he would be able to tell his version of events. *Id*. Yet, McCloud states that he was "never spoken to by any school district employee about this incident," *id.* at ¶¶ 42, 46, and was "never given the opportunity to explain his position and/or state his case," *id.* at ¶ 51(A). On December 11, 2024, McCloud met with Director of Personnel Christina McDougal.[3] *Id.* at ¶¶ 46, 51. During the conversation, McCloud "attempted to defend himself by saying 'She attacked me,'" to which McDougal allegedly responded, "That never happened." *Id.* at ¶ 51(A). By the end of the day, McCloud's employment at Northwest Middle School had come to an end.[4] *See id.* at ¶¶ 49(E), 69. McCloud alleges that McDougal told him that "if he voluntarily resign[ed] [from] the Reading School District," the school "would not object to his receiving unemployment compensation." *Id.* at ¶ 51(B). McCloud also alleges that McDougal threatened to "report [McCloud] to the 'State' insuring [he] would never get a similar job again." *Id.* Union Rep Britt urged McCloud to accept the agreement and resign. *Id.* at ¶ 66. McCloud alleges that he "felt he had no choice and was being coerced to accept." *Id.* at ¶ 51(D).

---

[3]     Ms. McDougal's first name is unclear because McCloud uses an assortment of first names when referring to her throughout Third Amended Complaint and his Memorandum in Opposition to the Motion to Dismiss, including "Christine," "Christina," "Cristina," and "Catherine." *See* Third Am. Compl. ¶¶ 25(B), 51, 61; Pl. Br. at 10, 13-14, 26, 29, 35. Because "Christina" is used the most often, the Court will refer to her as "Christina McDougal."

[4]     As noted by the Court in its October 7, 2025, Opinion, it remains unclear whether McCloud's employment ended because he was terminated (*i.e.*, fired) or because he resigned. *See* ECF No. 18 at 4 n.1. McCloud uses both the word "termination," *see* Third. Am. Compl. ¶¶ 11, 12(C), 25(C), 49(E), 51(E), 52, 69, 104, 107-08, 111, and the word "resign," *see id.* at ¶¶ 51, 66, throughout the Third Amended Complaint. The Court interprets this to be an allegation of either forced resignation or constructive termination. This Opinion may use the word "termination" to refer to McCloud's loss of employment, generally.

McCloud further alleges that in late December 2024, the school initiated formal criminal charges against him in connection with the December 6 physical altercation. *See id.* at ¶ 70. McCloud alleges that a hearing on the charges was held on March 3, 2025,[5] during which security footage of the incident was presented, and McCloud was found "not guilty" on the basis that he "was merely defending himself in response to [the parent's] actions." *Id.* at ¶ 71(A).

### B. Procedural History

On April 28, 2025, McCloud initiated this action by filing a Complaint in this Court against Reading School District. *See* ECF No. 1. On June 3, 2025, Reading filed its first Motion to Dismiss under Fed. R. Civ. P. 12(b)(6). *See* ECF No. 8. On June 24, 2025, McCloud filed an Amended Complaint, *see* ECF No. 12, and the Court dismissed the first Motion to Dismiss as

---

[5]     McCloud alleges that "School Resource Officer Alexandria pressed charges of assault and/or harassment" against him because of his altercation with a parent on December 6, 2024, *id.* at ¶ 70, but that such charges were resolved in a March 3, 2025, hearing presided over by "the Honorable Alvin Robinson," wherein McCloud was found "not guilty" and the parent was found "guilty," *id.* at ¶ 71(A). As stated in its October 2025 Opinion, the Court is unaware of a state court case in which "School Resource Officer Alexandria," or Reading School District, by extension, pressed criminal charges against *both* the school security officer and the parent with whom he had an altercation. The Court is similarly unaware of any state court proceeding involving McCloud, and finds no such hearing in the public record (unless expunged); instead, it notes public record of a court hearing presided over by the Honorable Alvin B. Robinson, Berks County Magisterial District Judge, on March 3, 2025, in which the *parent* described by McCloud in his Amended Complaint was adjudged guilty of the summary offense of harassment, under 18 Pa. Cons. Stat. § 2709. *Cmmw. v. Perez*, No. MJ-23105-NT-0000526-2024, (Magisterial District Judge 23-01-05, filed Dec. 30, 2024). (Though, notably, the offense date listed for the conduct leading to this charge is December 27, 2024, *not* December 6, 2024, the date of the alleged altercation). *See id.* Thus, to the extent McCloud alleges that Reading School District pressed charges against him, the Court cannot verify this fact in the public record. *See* 42 Pa. Cons. Stat. § 1515(a) (indicating that magisterial district judges have jurisdiction over summary offenses); 18 Pa. Cons. Stat. § 2709(c) (defining harassment as a summary offense). To the extent McCloud alleges that he was found "not guilty" of an assault charge on the same date by the same Magisterial District Judge, that is highly unlikely; assault is not a summary offense and would not have been decided via a summary trial. *See* 42 Pa. Cons. Stat. § 1515(a) (indicating that magisterial district judges have jurisdiction over "(1) [s]ummary offenses . . . (2) [m]atters arising under . . . The Landlord and Tenant Act of 1951 . . . (3) [c]ivil claims . . . (4) [hearings] [a]s commissioners to preside at arraignments, fix and accept bail . . . [and] (5) [o]ffenses . . . relating to driving under influence of alcohol or controlled substance."); 18 Pa. Cons. Stat. § 2701(b) (defining simple assault as a criminal misdemeanor of the third degree). *Compare* 18 Pa. S.C. § 106(b)(8)-(9) ("A crime is a misdemeanor of the third degree if it is so designated in this title or if a person convicted thereof may be sentenced to a term of imprisonment, the maximum of which is not more than one year," or if the misdemeanor is "without specification of degree."), *with id.* at § 106(c) ("An offense[] constitutes a summary offense if: (1) it is so designated in this title, or in a statute other than this title; or (2) if a person convicted thereof may be sentenced to a term of imprisonment . . . not more than 90 days.").

Separately, in the Third Amended Complaint McCloud suggests that *he* pressed charges against the parent involved in the December 6, 2024 altercation. *See* Third. Am. Compl. ¶ 71(A)(1) ("Officer Alexandra asked [McCloud] to drop his charges against Perez and Mr. McCloud declined."). The Court cannot verify or substantiate this via public record either.

moot, *see* ECF No. 11. On July 8, 2025, Reading filed a Motion to Dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6). *See* ECF No. 13. On October 7, 2025, the Court granted Defendant's Motion to Dismiss Plaintiff's Amended Complaint without prejudice and with leave to amend. *See* ECF Nos. 18 and 19. McCloud filed his Second Amended Complaint in late October 2025, *see* ECF Nos. 20-22, and then moved to amend it on February 12, 2026, *see* ECF No. 27. The Court granted leave to amend, *see* ECF No. 28, and McCloud's Third Amended Complaint was filed on February 12, 2026, *see* ECF No. 29.

The Third Amended Complaint features seven counts, the first two of which are labeled "42 U.S.C. § 1983," and appear to allege broad *Monell* liability on Reading's part, namely that Reading either acted "pursuant to" or "in violation of" a "policy, custom, [or] practice," or, alternatively, "failed to adopt clear policies and failed to train its deputies as to the role of its officers in employment disputes." Third Am. Compl. ¶¶ 76-89.[6] Count One also alleges violations of McCloud's First Amendment free speech rights and his Fourteenth Amendment Due Process rights, saying that he was "depriv[ed] of employment without court order and without providing an opportunity for the Plaintiff to be heard." *Id.* at ¶ 80. Counts Three, Four, and Six of the Third Amended Complaint claim disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 701 *et seq.*, the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. § 951 *et seq. See id.* at ¶¶ 90-101,

---

[6]    Though unclear whether McCloud alleges the existence of an unlawful policy or the absence of a lawful one, to the extent he alleges he was harmed by a policy at Reading, he says such policy was "executed by decision maker, policy maker Compliance Officer/Director of Personnel Christina McDougal," Third Am. Compl. ¶ 61, and "orchestrated through . . . Carl Britt, [Reading]'s head of security," *id.* at ¶ 62. McCloud further alleges that Reading "had a practice of investigating individuals and/or accusing them of specious violations as a pretext to terminating them." *Id.* at ¶ 34.

106-109. Counts Two, Five, Six and Seven of the Third Amended Complaint allege that Reading unlawfully retaliated against McCloud. *See* Third Am. Compl. Count Two alleges that Reading retaliated against McCloud's "efforts to exercise his constitutional rights," when, "through its deputies, [it] sought to institute criminal proceedings" against McCloud, after "refus[ing] to accept [McCloud]'s report into evidence and fail[ing] to permit [him] or his witness, Dr. Smith, to testify at his factfinding conference," *id.* at ¶ 85; Count Five alleges that Reading "terminated [McCloud] in retaliation for his need for reasonable accommodations," *id.* at ¶ 104; and Counts Six and Seven allege that Reading "wrongfully retaliated against [McCloud] by terminating [him] because he had taken approved FMLA leave," *id.* at ¶¶ 108, 111.[7]

On February 26, 2026, Reading filed a Motion to Dismiss Plaintiff's Third Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). *See* Motion, ECF No. 30. McCloud filed a Memorandum of Law in Opposition to the Motion to Dismiss on April 10, 2026, *see* Pl. Br., ECF No. 35, and Reading filed a Reply Brief in Support of its Motion to Dismiss on April 17, 2026, *see* Reply Br., ECF No. 36. The matter is now fully briefed and ready for decision.

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss under Rule 12(b)(6) – Review of Applicable Law

Under Rule 12(b)(6), the court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir.

---

[7]    The Third Amended Complaint also makes ambiguous references to a hostile work environment and instances of race or age discrimination. *See id.* at ¶ 32(A) (stating that Abdullah "made Northwest Middle School a hostile work environment" for McCloud by observing him during work hours); *id.* at ¶ 60 (suggesting that Reading had a history of terminating other African American employees and "threaten[ing] [them] with criminal prosecution" and that this created a hostile work environment for [McCloud]"); *id.* at ¶ 64 (stating that McCloud "is a member of the class covered by the provisions of the Older Workers Benefit Protection Act of 1990. 29 U.S.C. § 626(f)"); *id.* at ¶ 68 (alleging that his termination violated the ADEA). These are not pleaded as individual causes of action.

2002)) (internal quotation marks omitted). Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678-79 (further explaining that determining "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Also, "a document integral to or explicitly relied upon in the complaint may be considered." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations and italicization omitted). The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

**B.    42 U.S.C. § 1983 Claims – Review of Applicable Law**

42 U.S.C. § 1983 is the vehicle by which federal constitutional claims may be brought in federal court. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S.

42, 48 (1988). Additionally, a "defendant in a civil rights action must have personal involvement in the alleged wrongs." *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Moreover, "[b]ecause vicarious liability is inapplicable to … § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

"In actions under 42 U.S.C. § 1983, federal courts apply the state's statute of limitations for personal injury." *Sameric Corp. of Delaware, Inc. v. City of Phila.*, 142 F.3d 582, 599 (3d Cir. 1998). The statute of limitations for personal injury actions in Pennsylvania is two years. *See id.*; 42 Pa. Cons. Stat. § 5524. "A section 1983 cause of action accrues when the plaintiff knew or should have known of the injury upon which its action is based." *Sameric Corp.*, 142 F.3d at 599. "Rule 15(c) can ameliorate the running of the statute of limitations on a claim by making the amended claim relate back to the original, timely filed complaint." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001). The Rule provides: an "amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "The rationale of Rule 15(c) is that a party who has not been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." *Baldwin City Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984).

C.      **First Amendment Free Speech – Review of Applicable Law**

"The First Amendment generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (internal citations omitted). In deciding whether the plaintiff has a free speech right

guaranteed by the First Amendment, "the court must determine whether defendant has created a forum, and if so, what type, *i.e.*, was it 'public' or 'limited,' and if 'limited,' in what manner?" *Gregoire v. Centennial Sch. Dist.*, 674 F. Supp. 172, 176 (E.D. Pa. 1987). The Supreme Court has "identified three types of fora: [1] the traditional public forum, [2] the public forum created by government designation, and [3] the nonpublic forum." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985). Courts have identified a sub-category of the designated public forum known as "a *limited* public forum." *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1261 (3d Cir. 1992) (citing *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991)). "When the facilities . . . are limited by the government in respect to the use because of genuine special concerns and public obligations, the locale, though open as a forum, is deemed to be a limited one." *Gregoire*, 674 F. Supp. at 177.

In a limited public form,[8] "content-based restraints are permitted, so long as they are designed to confine the 'forum to the limited and legitimate purposes for which it was created.'" *Eichenlaub v. Twp. of Ind.*, 385 F.3d 274, 280 (3d Cir. 2004) (citing *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)). This test "is less strict than that applied in the case of a general open forum." *Id.*[9] "Two limitations remain. Any restrictions on speech must be viewpoint neutral and must be 'reasonable in light of the purpose served by the forum.'" *Id.* (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001) (cleaned up)).

---

[8]    "An example of [a] limited public forum is a university facility open for meetings of student groups, but not for the general public." *Eichenlaub v. Twp. of Ind.*, 385 F.3d 274, 280 (3d Cir. 2004).

[9]    "Streets and parks are examples of traditional public forums." *Eichenlaub*, 385 F.3d at 280. "Absent a compelling interest, speech in a public forum may not be regulated based upon content. Furthermore, in a public forum any restrictions as to time, place, and manner of speech (1) must be unrelated to content; (2) must be narrowly tailored to serve a significant governmental interest; and (3) must allow alternative ways of communicating the same information." *Id.* (internal quotations omitted).

**D.      Fourteenth Amendment Procedural Due Process – Review of Applicable Law**

"To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

Property interests are not created by the Constitution. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Rather, "[c]ore to the existence of an individual property interest is the requirement that the plaintiff have 'a legitimate claim of entitlement to' the interest at issue that stems from 'an independent source such as state law' or 'rules or understandings that secure certain benefits.'" *Siemens USA Holdings Inc v. Geisenberger*, 17 F.4th 393, 415 (3d Cir. 2021) (quoting *McKinney v. Univ. of Pittsburgh*, 915 F.3d 956, 960 (3d Cir. 2019) (quoting *Roth*, 408 U.S. at 577)). "The Supreme Court has made clear 'that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion.'" *Id.* (quoting *Town of Castle Rock, Co. v. Gonzales*, 545 U.S. 748, 756 (2005)). By contrast, "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,'" *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citing *Vitek v. Jones*, 445 U.S. 480, 493–94 (1980)), or "it may arise from an expectation or interest created by state laws or policies," *see id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 556–58 (1974)).

**E.      *Monell* Liability – Review of Applicable Law**

"[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). However, a municipality can be sued under Section 1983 in two contexts: First, if the municipality is

responsible for a failure or inadequacy that "reflects a deliberate or conscious choice," *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019), such as a failure to train or supervise which "amounts to 'deliberate indifference' to the rights of persons with whom [the municipality's] employees will come into contact," *Johnson v. City of Philadelphia*, 975 F.3d 394, 403 (3d Cir. 2020) (quoting *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999))). To establish "deliberate indifference" on the part of the municipality a plaintiff must allege that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest*, 930 F.3d at 106 (citing *Carter*, 181 F.3d at 357).

Second, "[l]ocal governing bodies . . . may be sued where 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Lebie v. Borough*, No. 13-cv-6819, 2014 WL 2085518, at \*2 (E.D. Pa. May 16, 2014) (quoting *Monell*, 436 U.S. at 690). "Liability is imposed when the policy or custom itself violates the Constitution, or where the policy or custom is the 'moving force' behind a constitutional violation by an employee of the local body." *Id.* (citing *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir. 1991)). "A policy is made 'when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.'" *Id.* (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990), *superseded by statute on other grounds*, 42 U.S.C. §§ 1981, 2000e et seq. (1991)). "A custom may exist when, 'though not authorized by law, such practices of state officials are so permanent and well settled that they

operate as law.'" *Id.* (quoting *Regan v. Upper Darby Twp.*, 363 F. App'x 917, 923 (3d Cir. 2010)). "Custom requires proof of knowledge and acquiescence by the decisionmaker." *Robinson v. City of Philadelphia*, No. 15-1574, 2015 WL 5965003, at *7 (E.D. Pa. Oct. 13, 2015) (quoting *McTernan v. City of York, Pa.*, 564 F.3d 636, 658 (3d Cir. 2009)). "It is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Lebie*, 2014 WL 2085518, at *2 (quoting *Andrews*, 895 F.2d at 1481); *see also id.* at *3 (concluding Third Circuit case law "unequivocally imposes on [p]laintiff an 'obligation to plead in some fashion that [a natural person] had final policy making authority, as that is a key element of a *Monell* claim'") (cleaned up) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 n.11 (3d Cir. 2010)) (italics not in original).

### F. Discrimination

#### i. Discrimination under the Americans with Disabilities Act (ADA) – Review of Applicable Law

"No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). An "employer" is defined as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." *Id.* at § 12111(5)(A). Claims of discrimination under the ADA are analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Cassidy v. Halyard Health, Inc.*, 391 F. Supp. 3d 474, 480 (E.D. Pa. 2019).

To state a prima facie case of discrimination under the ADA,[10] a plaintiff must also show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). "Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *See Stouch v. Twp. of Irvington*, 354 F. App'x 660, 666 (3d Cir. 2009) (citing *McDonnell Douglas*, 411 U.S. at 802-05). "The plaintiff then bears the burden of establishing that this proffered reason is a pretext for discrimination." *See id.*

The ADA defines "disability" as either (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1).[11] "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* at § 12102(2)(A).

---

[10]    In cases where "direct evidence of discrimination is discovered," a "plaintiff does not need to affirmatively plead all of the prima facie elements of a discrimination claim" to survive a motion to dismiss, because "the plaintiff might not need to prove each of those elements at trial." *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 136 (E.D. Pa. 2020) (citing *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002), *overruled in part on other grounds by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). In that instance, "to survive a motion to dismiss, a discrimination plaintiff needs only to allege 'enough facts to raise a reasonable expectation that discovery will reveal evidence of [the claim's] necessary element[s].'" *Id.* (citing *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016)).

[11]    Technically, this citation refers to The ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (as codified in provisions of 42 U.S.C. §§ 12101 *et seq.*), which became effective as of January 1, 2009. Any references herein to 42 U.S.C. § 12101, 12102, or its later subsections may use the acronym "ADA" rather than "ADAAA," but nonetheless refer to the post-amendment statute in place since 2009. *See* 42 U.S.C. § 12102(4) ("Rules of construction regarding the definition of disability").

### ii. Discrimination under the Rehabilitation Act of 1973, Section 504 – Review of Applicable Law

Section 504 of the Rehabilitation Act of 1973 ("RA") provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). "Section 504 of the [RA] and Title II of the ADA offer similar protections for persons with disabilities. Although Title II applies to all state and municipal governments, § 504 applies only to those agencies or departments receiving federal funds, and[] only [while] the funds are accepted." *Koslow v. Pennsylvania*, 302 F.3d 161, 166 n.3 (3d Cir. 2002). "The elements of a claim under the RA are the same [as those under the ADA], except that the plaintiff must also show that the program in question received federal dollars." *Durham v. Kelley*, 82 F.4th 217, 225 (3d Cir. 2023) (citing *Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021)). The other notable difference between these two statutory provisions relates to the causal link requirement. Section 504 of the RA requires that the "sole reason" for the discrimination be the disability, while the ADA requires only but-for causation. *See New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007). "However, a plaintiff bringing a Rehabilitation Act claim need not allege that [his] disability was the sole motivation for the policy or action that ultimately excluded [him] from receiving benefits." *See Smith v. Twp. of Warren*, No. 14-7178, 2016 WL 7409952, at *11 (D.N.J. Dec. 22, 2016) (citing *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1384 (3d Cir. 1991)). Rather, a plaintiff may satisfy the causation element by alleging that he was excluded from the benefits of the program because he was unable to access and/or utilize the benefits solely due to his disability. *See id.*

### iii. Discrimination under Pennsylvania Human Relations Act (PHRA), 43 Pa. Stat. § 1423 – Review of Applicable Law

The legal standards governing the ADA claim apply equally to a disability discrimination claim under the PHRA. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (finding that the district court properly treated the plaintiff's PHRA claims as coextensive with his ADA claim).

### G. Retaliation under the ADA, the RA, and PHRA, and the FMLA – Review of Applicable Law

Claims of retaliation based on one's utilization of disability accommodations or taking FMLA leave are also analyzed under the lens of employment-discrimination law. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012). Claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas. See* 411 U.S. 792. A prima facie case of retaliation based on the invocation of FMLA leave must demonstrate that the plaintiff (1) actually "invoked his right to FMLA-qualifying leave," (2) "suffered an adverse employment decision," and (3) "the adverse action was causally related to [his] invocation of rights." *See Lichtenstein*, 691 F.3d at 302.

## IV.   DISCUSSION

### A. Section 1983

As in the Amended Complaint, Counts I and II of the Third Amended Complaint appear to be brought under 42 U.S.C. § 1983, only. *See* Third Am. Compl. ¶¶ 76-89. Yet, "[s]ection 1983 is not itself a source of individual rights; rather, it provides a remedy for the violation of an individual right grounded in some independent source of federal law." *Rivera v. Edwards*, No. 23-1286, 2023 WL 8058753, at *2 (3d Cir. Nov. 21, 2023); *see also McLaine v. Lackawanna Cnty.*, 30 F. Supp. 3d 316, 320 (M.D. Pa. 2014) ("Section 1983 is not an independent source of

substantive rights, but merely provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws.") (internal quotations omitted). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West*, 487 U.S. at 48. McCloud alleges that Reading was "at all times relevant to this action . . . acting under color of state law," Third Am. Compl. ¶ 77, so the relevant inquiry becomes whether McCloud has alleged a constitutional deprivation.

Count I alleges, in part, that McCloud was deprived of his "rights to Free Speech" in violation of the First Amendment to the United States Constitution."[12] *Id.* at ¶ 78. Count I also alleges that McCloud was deprived of his rights "to Due Process of Law" in violation of the Fourteenth Amendment to the United States Constitution. *Id.* at ¶ 78. Importantly, however, these allegations are made broadly against the "Defendant" in this matter, and here, the only Defendant sued is Reading School District. "[V]icarious liability is inapplicable to . . . § 1983 suits." *Iqbal*, 556 U.S. at 676. To state a claim for any constitutional deprivation under Section 1983, McCloud "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* A "municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. So, the success of McCloud's

---

[12] This alleged constitutional violation is new and does not appear in prior amendments of McCloud's Complaint. Nonetheless, this First Amendment free speech claim is timely, as the facts giving rise to it occurred in early December 2024, and the claim relates back to the original Complaint, ECF No. 1, filed on April 28, 2025, *see* Fed. R. Civ. P. 15(c)(1)(B); *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001) ("Rule 15(c) can ameliorate the running of the statute of limitations on a claim by making the amended claim relate back to the original, timely filed complaint."), so it is within the two year statute of limitations, *see Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998) (explaining that "in actions under 42 U.S.C. § 1983, federal courts apply the state's statute of limitations for personal injury," and the statute of limitations for personal injury actions in Pennsylvania is two years); *see also* 42 Pa. Cons. Stat. § 5524.

constitutional deprivation claims—brought under the First[13] and Fourteenth[14] Amendments—

depends on whether McCloud can allege municipal liability on Reading's part.

_____

[13]    In support of this purported First Amendment free speech claim, McCloud alleges that he "was informed by his Union Representative, David Britt, and likewise by the Head of Security for [Reading], Carl Britt, that he was entitled to write a report and present evidence in defense of himself at a factfinding conference concerning the December 6th incident," Third Am. Compl. ¶ 79, but that he was "precluded from submitting any evidence," including "Dr. Smith's statement/incident report," *id.* at ¶ 48, because "no factfinding conference occurred," *id.* at ¶ 46. In deciding whether McCloud had a First Amendment free speech right to speak or present evidence at a factfinding conference held by his former employer, the Court must first determine whether such a factfinding conference constitutes a "forum," and if so, what type. *See Gregoire v. Centennial Sch. Dist.*, 674 F. Supp. 172, 176 (E.D. Pa. 1987). Since neither party produced briefing on this subject, the Court proceeds on the allegations of the Third Amended Complaint.

    Here, it is very likely that such a factfinding conference would constitute a "limited public forum," because (if it occurred) it would be held by Reading School District officials for the limited purpose of determining what exactly happened on December 6, 2024 – the date of McCloud's physical altercation with a student's parent. *Porter v. City of Philadelphia*, 975 F.3d 374, 387 (3d Cir. 2020) (A limited public forum is "a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects.") (citing *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009)). *See also Gregoire*, 674 F. Supp. at 177. The results of such a conference would be of special concern to Reading, because it has a public interest in keeping its students and visitors safe. The conference itself would also likely be limited to school personnel and certain witnesses to the altercation.

    In a limited public forum, content-based restrictions are permitted, so long as they are "reasonable in light of the purpose of the forum and viewpoint neutral." *Porter*, 975 F.3d at 387. If the Court accepts McCloud's factual allegations as true, *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008), the purpose of Reading's factfinding conference was to determine exactly what occurred between McCloud and the student's parent on December 6, 2024. It is reasonable to assume that Reading would want to interview McCloud to assist in that endeavor. Yet, McCloud maintains that he was "never spoken to by any school district employee about this incident," Third Am Compl. ¶ 42, was never interviewed about it, *id.* at ¶ 46, and that his written statement was "never utilized at a factfinding conference," *id.* Despite representing to McCloud that he was going to have an opportunity to tell his version of events at the factfinding conference, Reading "never g[ave] [McCloud] the opportunity to explain his position and/or state his case," *id.* at 51(A), because the scheduled factfinding conference was never held, *id.* at ¶ 46. The Court finds these allegations sufficient to suggest that, *if* municipal liability is established, Reading's refusal to allow McCloud to make a statement about the December 6 altercation could impose an unreasonable content restriction on his speech in the limited public forum created by the factfinding conference.

[14]    "To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). Compared to the Amended Complaint, McCloud's Third Amended Complaint obfuscates *which* Fourteenth Amendment protection(s) he claims to have been deprived of (*i.e.*, life, liberty, or property). In his Amended Complaint, McCloud alleged that Reading "deprived [him] of his property without due process of law in violation of the Fourteenth Amendment." *See* Am. Compl. ¶ 75, ECF No. 12. In dismissing the Amended Complaint, the Court found that no property deprivation was articulated, in part because "public 'at-will employment is not generally considered a property interest' protected by procedural due process." *See* ECF No. 18 at 15 (quoting *Wilson v. MVM, Inc.*, 475 F.3d 166, 177 (3d Cir. 2007) (citing *Thomas v. Hammonton*, 351 F.3d 108, 113 (3d Cir. 2003))). The Third Amended Complaint no longer explicitly alleges a "property" deprivation but instead alleges that Reading "depriv[ed] [McCloud] of employment without court order and without providing an opportunity for [him] to be heard." Third. Am. Compl. ¶ 80. As discussed in the Court's October 2025 Opinion, *see* ECF No. 18 at 15-16, loss of employment does not constitute a property deprivation under the Fourteenth Amendment unless McCloud can "prove that he had a constitutionally protected property right in continued employment," *Wilson*, 475 F.3d at 177 (citing *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 538 (1985)), or a "legitimate entitlement to such continued employment," *id.* (citing *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) (citing *Bd. of Regents of State Colleges*

### i. *Monell* Liability

Municipal liability may attach where it can be shown that a municipal defendant unlawfully "implement[ed] or execute[d] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," *Lebie*, 2014 WL 2085518, at *2 (quoting *Monell*, 436 U.S. at 690), and that the "policy or custom is the 'moving force' behind a constitutional violation by an employee of the local body." *Id.* (citing *Colburn*, 946 F.2d at 1027). Here, Counts I and II broadly allege that Reading, "pursuant to its policy, custom and practice," deprived McCloud of his constitutional rights. Third Am. Compl. ¶¶ 78, 82, 88. McCloud alleges that this "policy" was implemented by Reading, "executed by decision maker, policy maker Compliance Officer/Director of Personnel Christina McDougal," Third Am. Compl. ¶ 61, and "orchestrated through . . . Carl Britt, [Reading]'s head of security," *id.* at ¶ 62. Yet, at no point does McCloud describe what this "policy" was, other than to say that "[t]he plans, custom and pattern of actions of Defendant constituted a policy of Defendant." *Id.* at ¶ 61. While this language is somewhat vague, it could refer to the allegations in the preceding paragraph, in which McCloud suggests that Reading had a history of terminating other African American employees and "threaten[ing] [them] with criminal prosecution." *See id.* at ¶ 60. If true, there is still no indication that this alleged pattern of activity was carried out by Reading pursuant to "an official proclamation, policy, or edict," so as to constitute a "policy" for municipal liability purposes. *See Lebie*, 2014 WL 2085518, at *2 (quoting *Andrews*, 895 F.2d at 1480).

---

*v. Roth*, 408 U.S. 564, 577 (1972))), as supported by, e.g., the existence of an "employment contract [containing] a 'just cause' provision," *id.* (citing *Kelly v. Sayreville*, 107 F.3d 1073, 1077 (3d Cir. 1997)). There is nothing in McCloud's pleadings to indicate that he had a constitutionally protected property right in, or entitlement to, his at-will employment with Reading School District as a school security officer. Thus, there has been no showing of a property deprivation under the Fourteenth Amendment. The Court is also unaware of how job termination could constitute a deprivation of McCloud's protections to life and liberty, so even *if* municipal liability is established, the Court finds that no Fourteenth Amendment deprivation has been alleged.

To the extent McCloud intends to show that such behavior was a *custom* at Reading School District, he must show that such practices were "so permanent and well settled that they operate as law,'" *Id.* (quoting *Regan*, 363 F. App'x at 923), and must show "proof of knowledge and acquiescence" by the municipal decisionmaker. *Robinson*, 2015 WL 5965003, at *7 (quoting *McTernan*, 564 F.3d at 658). Despite highlighting the experiences of four other former employees of Reading, *see* Third Am. Compl. ¶¶ 54-60, McCloud has not established that Reading had a pervasive and ongoing custom of discriminatorily terminating employees based on their race or disability, let alone a discriminatory custom that "decisionmaker" McDougal knew of and supported. Without some deliberate action on her part, or a connection between this action and McCloud's alleged constitutional deprivations, the Court cannot find municipal liability. Aside from these allegations, the only other "policy or custom" referenced in the Third Amended Complaint is the no-eating mandate issued by Abdullah on October 25, 2024. *Id.* at ¶ 25(A). As was the case in his Amended Complaint, *see* ECF No. 18 at 14, McCloud again does not connect this mandate to an alleged constitutional deprivation. The Third Amended Complaint does not factually support McCloud's broad allegations that Reading acted unlawfully "pursuant to its policy, custom and practice." *See* Third Am. Compl. ¶¶ 78, 82, 88.

Markedly, in the same breath that McCloud alleges Reading promulgated and carried out an unlawful policy or custom, McCloud also alleges that Reading "acted in violation of a [preexisting] policy or custom," *id.* at ¶ 80, and, simultaneously, "failed to adopt clear, lawful policies," *id.* at ¶ 81, all of which supposedly led to his constitutional deprivations. With respect to the former assertion, McCloud does not point to any internal policy which Reading and its officers disobeyed. With respect to the latter assertion, this Court has often reiterated that municipal liability requires *deliberate* action attributable to the municipality—and thus an

21
071326

allegation that Reading *failed* to adopt a policy is insufficient to support a claim for the deprivation of McCloud's constitutional rights. *See* ECF No. 18 at 15 (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 415 (1997)).

Lastly, McCloud broadly alleges that Reading "failed to train its deputies as to the role of its officers in employment disputes." Third Am. Compl. at ¶ 87; *see id.* at ¶¶ 81-82, 88. The Court finds that not only is this allegation unsupported by any factual detail, but it is contradicted by other allegations in the Third Amended Complaint. *See id.* at ¶ 32(C) (explaining that pursuant to statute, school police officers and municipal police officers in Reading receive "919 hours of training" and education, "which covers 20 areas"); *id.* at ¶ 35(A) ("In November of 2024, all school security officers received training."); *id.* at ¶ 35(B) ("During Thanksgiving break in 2024, Carl Britt, the Director of Security for the entire School District, participated in training of security guards during which he instructed officers, including [McCloud]."). Hence, the Court finds McCloud's allegations that Reading "failed to train or supervise" its deputies or officers to be unfounded. The Court has no reason to conclude that Reading was deliberately indifferent with respect to its officers' behavior. *See Johnson*, 975 F.3d at 403. Without establishing a basis for municipal liability under *Monell*, McCloud fails to state a claim against Reading pursuant to 42 U.S.C. § 1983. Since the Court previously advised McCloud—two amendments ago—to fix the pleading deficiencies in Counts I and II, and the Court now considers McCloud's Third Amended Complaint deficient in the same respects, the Court is of the impression that no additional facts exist which would support McCloud's inexplicit theory of municipal liability— hence leave to amend would be futile. *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) ("[A] District Court must permit a curative amendment, unless an amendment would be

inequitable or futile."), *abrogated on other grounds by Rivera v. Monko*, 37 F.4th 909 (3d Cir. 2022). Counts I and II will be dismissed with prejudice.

## B. Discrimination under the ADA, the RA, and PHRA, and the FMLA

McCloud also fails to state a plausible disability discrimination claim under the ADA, RA, PHRA or FMLA, as attempted in Counts III, IV and VI of the Third Amended Complaint. Claims of discrimination are analyzed through the framework established in *McDonnell Douglas,* 411 U.S. at 792, which places the initial burden on the plaintiff to demonstrate a *prima facie* case of discrimination.[15] McCloud must (1) be disabled within the meaning of the ADA; (2) be otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) have suffered an otherwise adverse employment action as a result of discrimination. *See Gaul*, 134 F.3d at 580.

### i. Disabled within the Meaning of the ADA[16]

Under the first element, a plaintiff can be said to have a "disability" if he can show that he has (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) "a record of such an impairment;" or is (3) "regarded as having such an impairment." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating . . . concentrating, thinking, communicating, and working." *Id.* at § 12102(2)(A). "The determination of whether an individual is substantially limited in a major life activity must be made 'on a case-by-case basis.'" *Matthews v. Pa. Dep't of Corr.,* 613 F. App'x 163, 167 (3d Cir. 2015) (quoting *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999)). Additionally, "[t]he determination of

---

[15]   Additional steps of the *McDonnell* analysis are not listed as McCloud fails to meet his initial burden.
[16]   "The elements of a claim under the RA are the same [as those under the ADA], except that the plaintiff must also show that the program is question received federal dollars." *See* ECF No. 18 (citing *Durham v. Kelley* 82 F.4th 217, 225 (3d Cir. 2023)). Therefore, all disability discrimination claims are analyzed concurrently.

whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication [or] medical supplies." 42 U.S.C. § 12102(4)(E)(i).[17] To qualify for protection under the ADA based on a "a physical or mental impairment," a plaintiff must plead the degree to which the impairment "substantially" impacts a major life activity. *Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 513 (E.D. Pa 2012).[18] The plaintiff also must demonstrate *how* he is limited by the condition, not merely that the condition exists. *See Douse v. Walmart,* No. 24-cv-2541, 2024 WL 3744357, at *1, 4-5 (E.D. Pa. August 9, 2024).[19] When a court is forced to speculate how the plaintiff is limited by the existence of an impairment, the complaint fails to meet the *Twombly* plausibility standard of review. *Id.* at 4; *see Twombly,* 550 U.S. at 570 (2007).

---

[17]    *See also Sulima v. Tobyhanna Army Depot* 602 F.3d 177, 186 n.3 (3d Cir. 2010) (explaining that one of the reasons that the ADA was amended in 2008 was to overturn *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999), "where it [was] held that the effects of medication and other mitigating measures used by the plaintiff must be taken into account when deciding whether an underlying impairment, towards which the mitigating measures are directed, actually substantially limits a major life activity.")

[18]    In 2008, the ADA was amended by the ADAAA to include certain impairments, including "cancer, HIV-AIDS, epilepsy, *diabetes*, [and] multiple sclerosis. . . ." *Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d. 502, 513 (E.D. Pa 2012) (citing 154 Cong. Rec. H8286 (2008) (statement of Rep. George Miller)) (emphasis added). Despite lawmakers' intent to widen the scope of what may count as a protected disability, "even under the relaxed ADAAA standards[,] a plaintiff is still required to a plead a substantially limiting impairment." *Id.* "Such analysis require[s] a determination that the Complaint sufficiently pleaded the degree of limitation caused by the impairment and the nature of the alleged impairment at the time of his termination." *Id.* In *Koller v. Riley*, this District found that a plaintiff failed to adequately plead a disability when, although the plaintiff alleged painful symptoms following surgery that "hindered" his ability to work, plaintiff failed to establish that the impairment "substantially limited" any major life activity. *Id.* at 514. Additionally, in *Koller*, the "[p]laintiff conclusively state[d]" that he "was physically impaired and disabled within the meaning of the ADA." *Id.* at 514-15. The court found that a combination of conclusory statements and lack of detail in pleading a substantial limitation "simply do not rise to the level necessary to infer any disability under the ADA." *Id.* at 515.

[19]    In *Douse v. Walmart*, the plaintiff was diabetic and overweight. No. 24-cv-2541, 2024 WL 3744357 at *1 (E.D. Pa. August 9, 2024). The plaintiff alleged that she experienced "unequal terms and conditions of her employment and age discrimination. . . ." *Id.* In at least one report to the defendant employer's Human Resources Department, plaintiff referenced a neuropathy condition. *Id.* In a suit brought partially under the ADA, the plaintiff alleged that the defendant employer failed to accommodate her disability. *Id.* In dismissing plaintiff's ADA claim, this Court reasoned that plaintiff "d[id] not allege how she [was] in any way limited by [her] conditions." *Id.* at 4. Further, this Court reasoned that "[b]y listing her impairments without any facts about *how* they limit her, [plaintiff] has not adequately alleged that she suffers from a disability." *Id.* (emphasis added); *see also Karipidis v. ACE Gaming LLC*, No. 09-3321, 2010 WL 2521209, at *8 (D.N.J. June 9, 2010) ("By simply stating that the plaintiff lives with an injury, illness[,] or impairment without alleging that the impairment substantially limits a major life activity creates a defect in the complaint.").

In his Amended Complaint, McCloud previously failed to demonstrate how his diabetes substantially limited his major life activities, alleging nothing more than his "status as an insulin-dependent diabetic . . . [and] includ[ing] 'no factual allegations of impairment or limits on major life activities whatsoever'—only that he must periodically snack to regulate his sugar levels." ECF No. 18 at 20 (citing *Eyajan v. Nesco Resource*, No. 1:18-cv-00222, 2019 WL 13261833, at *4 (W.D. Pa July 23, 2019)). Here, McCloud's Third Amended Complaint bridges that gap. It alleges that if McCloud "does not have the ability to eat snacks and drinks during work he will black out or fall, or both." Third Am. Compl. ¶ 28(B). Periodically losing consciousness would certainly impair McCloud's ability to work, if not bar him from working completely. The ability to work is considered a major life activity. *See* 42 U.S.C. § 12102(2)(A). Thus, the Court finds that McCloud has alleged sufficient facts to show that he has "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1)(A-C).[20]

### ii. Otherwise Qualified to Perform Essential Duties

In addition to his disabled status, McCloud must show that he was otherwise qualified to perform the essential duties of his role as a school security officer, with or without reasonable accommodation by the employer. *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996). McCloud "can satisfy this burden if he can make at least a facial showing that his proposed accommodation is possible." *Gaul,* 134 F.3d at 580 (citing *Shiring*, 90 F.3d at 832). Here, the

---

[20]    McCloud correctly asserts that the 2008 Amendment to the ADA intentionally lowered the standard for pleading the details of one's disability. *See* Pl. Br., ECF No. 35, at 20. Had McCloud only alleged a conclusory statement of disability and/or a mere diagnosis, he would not have met this lower standard. *See Eyajan v. Nesco Resource*, No. 1:18-cv-00222, 2019 WL 13261833, at *4 (W.D. Pa July 23, 2019) (finding that, where the plaintiff listed himself as diabetic without providing details of how it impacted a major life activity, such conclusory statements were not enough to meet the low standard of pleading disability under the ADA). Now that McCloud has explained how his diabetes physically impacts his daily activities—causing him to lose consciousness when his sugar levels get too low—he has pleaded more than bare conclusions. Accepting these facts as pleaded and construing them in the light most favorable to the non-moving party, the Court finds that McCloud has shown he is disabled within the meaning of the ADA.

facts demonstrate not only that accommodation was possible, but that Reading accommodated McCloud's diabetic condition several times. Reading "knew of [McCloud]'s disability and previously accommodated him by allowing him to eat snacks and drink fluids while working." Third Am. Compl. ¶ 12(D). Even after the "no eating mandate" was implemented, McCloud was instructed to "[s]tep into a room and take a break" when and if he needed to.[21] *Id.* at ¶ 26. The record shows that McCloud also applied for, and received, FMLA leave to accommodate a "diabetic episode." *Id.* at ¶ 30. The facts indicate that McCloud was able to perform his job tasks satisfactorily with one or more of these accommodations. Accepting these factual allegations as true, the Court therefore finds that McCloud is otherwise qualified to perform the essential duties of a security officer with reasonable accommodation, as demonstrated by his history of doing so.

### iii.  Causation: Adverse Employment Action as a Result of Discrimination

"The law is clear that [an ADA plaintiff] must prove that []he was terminated[22] *because of* [his] disability not that [his] disability is the reason for or related to [his] misconduct." *Hileman v. West Penn Allegheny Health System, Inc.*, 2:23-cv-01119, 2025 WL 461588, at *3 (W.D. Pa. 2025), *appeal pending in* No. 25-1459 (3d Cir. 2025) (emphasis added). "Although an employer is prohibited from discharging an employee based on a disability, an employer is not prohibited from discharging an employee based on misconduct, even if that misconduct is related to his disability." *Id.* (citing *Hoffman v. City of Bethlehem*, 739 F. App'x 144, 149 (3d Cir. 2018)). "An employer may act on a legitimate, nondiscriminatory reason even if it is 'wrong or mistaken.'" *Id.* at *4 (quoting *Arana v. Temple Univ. Health Sys.*, 776 F. App'x 66, 70 (3d Cir.

---

[21]    While McCloud alleges that he did not take advantage of this accommodation because he was "concerned he was being set up for a write-up," Third Am. Compl. ¶ 27, this is of no effect in determining whether McCloud was qualified and able to do his job with reasonable accommodations.

[22]    The analysis of this element is performed *arguendo* that McCloud experienced an adverse employment action because the pleading is ambiguous as to the circumstances regarding the timeline and details of the end of McCloud's employment with Reading. *Supra* note 4.

2019) (affirming summary judgment and finding that an employer had established a legitimate, nondiscriminatory reason for terminating an employee because the employer reasonably believed that the employee was sleeping while working) (citing *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994))). An ADA claim must provide that the employee's disability was a determinative factor in their termination. *See Fiorentini v. William Penn Sch. District*, 665 F. App'x 229, 237 (3d Cir. 2016).

Here, McCloud contends that "his disability and FMLA status" are causally related to his termination. *See* Pl. Br. at 29.[23] In support of this, McCloud alleges certain facts to suggest that his supervisors had "targeted" him for his diabetes, *see* Third Am. Compl. ¶ 49(A); *see also id.* at ¶¶ 25(A), 37, but does not show that these events are at all related to his termination. McCloud alleges that once the no-eating mandate was issued, the accommodation he was given (*i.e.*, permission to "[s]tep into a room and take a break" if he needed to eat or drink) was feigned because "[s]ecurity officers are not supposed to be in classrooms and have no breakroom." *See id.* at ¶¶ 26-27. McCloud was "concerned he was being set up for a write-up," and so did not take advantage of this accommodation. *Id.* at ¶ 27. In another instance, McCloud alleges that Reading "had a practice of investigating individuals and/or accusing them of specious violations as a pretext to terminating them." *Id.* at ¶ 34. McCloud further alleges that a supervisor issued him two write-ups while the supervisor knew he was on FMLA leave, *id.* at ¶¶ 37, 71, one of which was a write-up for drinking tea on the job, which he alleges was "related to his diabetes," *id.* at ¶ 37. Importantly, however, McCloud fails to show that his write-ups were issued *because* he took FMLA leave or that they were issued *to ensure* his later termination. Even if he had,

---

[23]    McCloud's Brief in Opposition to the Motion to Dismiss contends that his disability and FMLA status are "casually" related to his termination, Pl. Br. at 29, but context indicates that this was likely a typographical error and McCloud meant to say "causally"—the Court thus reads this to assert a causal link between his accommodated diabetic status and his ultimate termination.

McCloud still cannot point to circumstantial evidence, beyond the temporal proximity of his write-ups to his FMLA leave, which would connect his termination to his diabetic condition. Any connection between his diabetes and his termination is merely conjectural.

Without a causal connection, McCloud has failed to demonstrate that his diabetes was a determinative factor in his termination. The Third Circuit has before declined to find causation in an ADA claim where a plaintiff does not point to any evidence that his disability was connected to, let alone a "determinative factor" in, the decision to end his employment, or where the record shows that there was another likely reason for the termination. *See Fiorentini*, 665 F. App'x at 237 (affirming a judgment for a school district where plaintiff teacher did not point to any evidence that her disability was "connected to, let alone a 'determinative factor' in, the decision to furlough her," and the record showed that she was likely furloughed because "she lacked a Pennsylvania teaching certification"). Here, the record reflects that McCloud's termination was likely due, in large part, to his physical altercation with a student's parent on December 6, 2024. *See* Third Am. Compl. ¶¶ 40-46. Following the incident (and McCloud's failure to report it), Reading conducted an investigation, which culminated in a conversation between Personnel Director McDougal and McCloud on December 11, 2024. *Id.* The subject of that conversation appears to have been the December 6 altercation, because during the conversation, McCloud "attempted to defend himself by saying 'She attacked me,'" to which McDougal allegedly responded, "That never happened." *Id.* at ¶ 51(A). Despite McCloud's assertions that "no factfinding conference occurred," *id.* at ¶ 46, and that he "was never given the opportunity to explain his position and/or state his case," *id.* at ¶ 51(A), the record shows that the December 11, 2024, meeting was intended, at least in part, to broach the events of December 6, 2024. By the end of their conversation, McDougal was encouraging McCloud to consider a voluntary

resignation. *Id.* at ¶ 51(B)-(E). By the end of the day, McCloud's employment with Reading had ended. *Id.* at ¶ 51(E).

McCloud does not argue that his altercation with the student's parent was the result of a diabetic episode or at all related to his diabetes. Even if he did, Reading is nonetheless entitled to terminate McCloud's employment based on his misconduct alone. *See Hileman*, 2025 WL 461588, at *3. Reading argues that McCloud's physical altercation with a parent was not only a determinative factor leading up to its employment decision, but that the altercation serves as a legitimate nondiscriminatory reason for McCloud's termination. *See* Motion at 28-29; Reply Br. at 6. Given the sequence of events articulated in the Third Amended Complaint, the Court is inclined to agree. The record demonstrates that McCloud's unsanctioned behavior on December 6, 2024 and failure to comply with Reading's reporting requirements comprised legitimate reasons for his termination—unrelated to his disability. McCloud has failed to plead enough facts to show that he suffered an adverse employment decision *as a result of* disability discrimination, *see Gaul*, 134 F.3d at 580, so these claims fail, and must be dismissed. Since this is the fourth iteration of McCloud's complaint, the Court is unconvinced that additional facts or circumstantial evidence exist to draw a causal nexus between McCloud's diabetes and his termination. The Court finds that further amendment would be futile,[24] and so dismisses

---

[24]     The Court's October 7, 2025, Opinion dismissed McCloud's Amended Complaint without prejudice and cautioned that "any amended pleading . . . must plead its counts and supporting facts with specificity, or risk dismissal with prejudice for failure to ameliorate these deficiencies," as highlighted in the Motion to Dismiss. *See* ECF No. 18, at 17 n.7. Reading's Motion to Dismiss the Amended Complaint argued, in part, that McCloud's disability discrimination claims should be dismissed because he failed to articulate a causal connection between an adverse employment action and his disability. *See* ECF No. 13-1 at 16-17. Reading's Motion to Dismiss the Third Amended Complaint makes the same argument, among other arguments for dismissal. *See* Motion, at 21-22. McCloud's now Third Amended Complaint has failed to ameliorate these deficiencies. Further leave to amend the disability discrimination claims is not warranted, as McCloud has demonstrated that any further attempts to do so would be futile. *See Afzal v. New Jersey Bd. of Med. Examiners*, No. 22-1609, 2022 WL 4533826, at *2-3 (3d Cir. Sept. 28, 2022) (finding that district court did not abuse its discretion in dismissing an amended complaint with prejudice, when, after being given multiple opportunities to plead adequate factual content to support a reasonable inference that defendants were liable for the claims brought, the plaintiff still failed to do so); *Garrett v. Wexford Health*, 938 F.3d 69, 85 n.22 (3d Cir. 2019) (explaining the folly of permitting multiple amendments over the course

McCloud's disability discrimination claims (Counts III, IV, and VI) with prejudice. *See Alston*, 363 F.3d at 235 ("[A] District Court must permit a curative amendment, unless an amendment would be inequitable or futile.").

### C.  Retaliation under the ADA, the RA, and PHRA, and the FMLA

Retaliation claims based on one's utilization of disability accommodations or taking FMLA leave are also analyzed under the lens of employment discrimination law. *See Lichtenstein*, 691 F.3d at 302. Claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas*. *See* 411 U.S. 792. A prima facie case of retaliation based on the invocation of FMLA leave must demonstrate that the plaintiff (1) actually "invoked his right to FMLA-qualifying leave," (2) "suffered an adverse employment decision," and (3) "the adverse action was causally related to [his] invocation of rights." *See Lichtenstein*, 691 F.3d at 302.

The Court's October 2025 Opinion dismissed McCloud's retaliation claim in part for failure to meet Rule 8 pleading standards. While the Court did not reach the merits of the claim, it reasoned that if it had, McCloud's retaliation claim was unlikely to survive a motion to dismiss because McCloud did not plead a "protected activity, let alone allege facts in support of a causal connection to an adverse action by Reading." *See* ECF No. 18 at 17 n.7 (internal quotation marks omitted). At the same time, the Court cautioned McCloud to amend his complaint with particular attention to the deficiencies then outlined. *See id.*

Here, McCloud has filed a Third Amended Complaint which pleads, as independent counts, two retaliation claims, and alludes to retaliation in two other claims. Count V alleges that

---

of nearly two years when an earlier futility analysis would have prohibited further amendments by the plaintiff); *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 111 (3d Cir. 2002) ("[P]laintiffs whose complaints fail to state a cause of action are entitled to amend their complaint unless doing so would be inequitable or futile.").

Reading terminated McCloud "in retaliation for his need for reasonable accommodations," Third Am. Compl. ¶ 104, and Counts VI and VII allege that Reading "terminat[ed] his employment because [McCloud] was taking FMLA leave," *id.* at ¶ 108; *see id.* at ¶ 111. These counts allege retaliation under the ADA, PHRA, and FMLA. Accepting the facts in the Amended Complaint as true, *see Phillips*, 515 F.3d at 233, the Court finds these allegations sufficient to show an invocation of McCloud's right to FMLA-qualifying leave, *see* Third Am. Compl. ¶¶ 28-30 (explaining that McCloud was offered, and took, FMLA leave while still employed by Reading), and that his termination constitutes an adverse employment decision, *see id.* at ¶ 51(E); section IV(B)(iii), *supra*. The Court does not find, however, that his termination was "causally related to [his] invocation of rights." *See Lichtenstein*, 691 F.3d at 302. As discussed in large part above, *see* section IV(B)(iii), *supra*, McCloud does not draw a causal link between his termination and his disability or his need for work accommodations. He alleges only that, shortly after he was approved for intermittent FMLA leave, Reading began to "subject" him to "retaliatory discipline," Third Am. Compl. ¶ 28(C), and that he "came under heightened scrutiny . . . in retaliation for his FMLA status," *id.* at ¶ 29(B). By this language, McCloud seemingly refers to the two "write-ups" he received in early December 2024 from Security Lead Abdullah—one of which was for "sipping tea" while on the job, and the other of which was for "wrongfully recording video footage while on security." *See id.* at ¶¶ 37-38. There is no indication that either write-up was given *in retaliation for* McCloud needing to take FMLA leave or his actually taking FMLA leave. Nothing in the Third Amended Complaint suggests that Reading, via its officers, issued these write-ups to McCloud for any reason other than the furtherance of employee policy. There is no evidence to suggest that *only* disabled employees, or those who sought FMLA leave, were disciplined for similar transgressions. Moreover, there is no evidence

31
071326

of discriminatory animus by any Reading officer against disabled employees or those who took FMLA leave, generally. Accordingly, the Court cannot find a causal nexus between these events and McCloud's termination.

Separately, McCloud alleges that the "institution of criminal charges by [Reading] was an act of retaliation against [McCloud] in response to his efforts to assert his constitutional rights." *Id.* at ¶ 73; *see id.* at ¶ 85. As discussed above, the Court is unable to verify that any criminal charges were pressed *by* Reading *against* McCloud – let alone any instigated by retaliatory motive. *See* note 5, *supra*. Even if they were, it is unclear what constitutional rights McCloud was exercising when Reading "institute[d] criminal proceedings" against him. *See* Third Am. Compl. ¶ 85. In Count II, McCloud loosely suggests that his First Amendment free speech rights and his Fourteenth Amendment due process rights were violated, and that he "was harmed by these acts of retaliation"—alluding to his thwarted attempt to testify or present evidence at his factfinding conference, *id.* at ¶¶ 85-86, which Count I labeled a violation of his First and Fourteenth Amendment rights. Yet, as discussed above, the success of McCloud's constitutional violation claims under the First and Fourteenth Amendments depends on whether he can allege municipal liability on Reading's part—which he cannot. *See* section IV(A), *supra*. Without a basis on which to bring a claim for a constitutional deprivation, McCloud's retaliation claims stemming from that constitutional deprivation fail. The retaliation claims, as pleaded in Counts V through VII, and tangentially in Count II, are thus dismissed with prejudice.[25] *See Alston*, 363

---

[25]    Though the Court's October 7, 2025, Opinion "did not factor into [its] decision" its brief Rule 12(b)(6) discussion of McCloud's retaliation allegations, it did caution that any amendments to the complaint submitted thereafter should be made with special attention to the deficiencies highlighted by the Court's Opinion and the arguments made in the Motion to Dismiss. *See* ECF No. 18. *See* ECF No. 18, at 17 n.7. The Court's Opinion cautioned that the facts in support of any retaliation claim must be pleaded with specificity. *See id.* Reading's Motion to Dismiss the Amended Complaint argued, in part, that McCloud's retaliation claim should be dismissed because he failed to allege sufficient facts to establish a basis for municipal liability, and failed to establish a causal connection between his disability and any adverse employment action. *See* ECF No. 13-1 at 8. Reading's Motion to Dismiss the Third Amended Complaint makes largely the same arguments. *See* Motion, at 9, 11, 24, 27-28.

F.3d at 235 ("[A] District Court must permit a curative amendment, unless an amendment would be inequitable or futile.").

### D. Other Forms of Discrimination not Pleaded

#### i. Hostile Work Environment

As in the Amended Complaint, McCloud's Third Amended Complaint mentions in passing that he was subject to a hostile work environment, but does not plead it as a separate cause of action. To state a prima facie claim for hostile work environment under the ADA or PHRA, a plaintiff must allege that:

> (1) [s/he] is a qualified individual with a disability under the ADA, (2) [s/he] was subject to unwelcome harassment, (3) the harassment was based on [his/her] disability or request for an accommodation, (4) the harassment was sufficiently severe or pervasive to alter the conditions of [his/her] employment and create an abusive working environment, and (5) the employer knew or should have known of the harassment and failed to take prompt, effective remedial action.

*Koller*, 850 F. Supp. 2d at 515-16 (citing *Lowenstein v. Catholic Health East*, 820 F. Supp. 2d 639, 646–47 (E.D. Pa. 2011) (citing *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999))). To determine whether the harassment was "severe or pervasive" a court "must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hanafy v. Hill Int'l, Inc.*, 669 F.

---

McCloud's now Third Amended Complaint has failed to ameliorate these deficiencies, despite pleading his retaliation claims as independent causes of action. *See* Motion. To the extent he alleges that Reading retaliated against him by terminating him or instituting criminal charges, he fails to establish the necessary causal connection between these adverse actions and his disability, his use of accommodations, or any other protected activity. McCloud also has not established municipal liability on Reading's part. Further leave to amend the retaliation claims is not warranted, as McCloud has demonstrated that any further attempts to do so would be futile. *See Afzal*, 2022 WL 4533826, at *2-3 (finding that district court did not abuse its discretion in dismissing an amended complaint with prejudice, when, after being given multiple opportunities to plead adequate factual content to support a reasonable inference that defendants were liable for the claims brought, the plaintiff still failed to do so); *Garrett*, 938 F.3d 69, 85 n.22 (explaining the folly of permitting multiple amendments over the course of nearly two years when an earlier futility analysis would have prohibited further amendments by the plaintiff); *see also Grayson*, 293 F.3d at 111 ("[P]laintiffs whose complaints fail to state a cause of action are entitled to amend their complaint unless doing so would be inequitable or futile.").

Supp. 3d 419, 440 (E.D. Pa. 2023) (quoting *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 132 (E.D. Pa. 2020)). A plaintiff must also show that the work environment in question is "objectively" hostile. *Walton*, 168 F.3d at 667 (referencing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). "Workplace conduct must be viewed in its entirety, but isolated incidents do not amount to discriminatory changes in the conditions of employment." *Douglas v. Kensington Cmty. Corp. for Individual Dignity*, 775 F. Supp. 3d 881, 898 (E.D. Pa. 2025) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)).

Here, McCloud alleges that Security Lead Abdullah "made Northwest Middle School a hostile work environment" for him by observing him during work hours, *id.* at ¶ 32(A), and that his colleagues made negative comments regarding his performance, such as "radio chatter" in which the middle school principal criticized him and fellow security officers made "snide comments." Third Am. Compl. at ¶ 21. McCloud also alleges that "[o]n information and belief . . . other African American employees of [Reading] were terminated and subsequently either threatened with criminal prosecution or prosecuted and/or never provided any meaningful opportunity to defend themselves," and that "[t]hese circumstances[] created a hostile work environment for [McCloud]," *id.* at ¶ 60. As was the case in October 2025, McCloud still has not shown that he was targeted or surveilled or received negative comments or reprimands *because of* his diabetes or request for accommodations. *See Koller*, 850 F. Supp. 2d at 515-16. Separately, McCloud has not demonstrated how Reading's prior termination of *other* African American employees subjected *him* to unwelcome harassment, let alone how such harassment altered the conditions of his employment. *See id.* Without such a showing, these instances of conduct cannot amount to a "discriminatorily hostile work environment." *Mercer v. Se. Pennsylvania Transit*

*Auth.*, 26 F. Supp. 3d 432, 443-44 (E.D. Pa. 2014) (citing *Harris*, 510 U.S. at 21), *aff'd sub nom.*

*Mercer v. SEPTA*, 608 F. App'x 60 (3d Cir. 2015). The Court is similarly unable to find that

such conduct was severe or pervasive. McCloud only alleges one known instance of surveillance,

Third Am. Compl. ¶ 32(A), the write-up for which was later rescinded, *see id.* at ¶ 37, and

McCloud does not connect Reading's alleged mistreatment of other employees to himself or his

own work environment, *id.* at ¶ 60. McCloud has again failed to state a claim for hostile work

environment under the ADA or any other legal grounds. To the extent such a claim is asserted, it

is dismissed with prejudice. *See Alston*, 363 F.3d at 235.

### ii. Title VII, Race and Age

Like the Amended Complaint, McCloud's Third Amended Complaint also alludes to

other potential theories of liability without stating claims for them outright. In the Introduction,

McCloud asserts that he "now further amends his previously filed Complaints to assert claims

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,"[26] but then never mentions

---

[26]    Federal law prohibits employment discrimination based on race, color, religion, sex, national origin, age, and disability. *See E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 448-49 (3d Cir. 2015). Disparate treatment claims brought under Title VII are analyzed using the three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Rabinowitz v. AmeriGas Partners, L.P.*, 252 F. App'x 524, 527 (3d Cir. 2007). "Under the *McDonnell Douglas* paradigm, an employee must first establish a prima facie case of discrimination, after which the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision." *Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005). "If the employer articulates one or more such reasons, the aggrieved employee must then proffer evidence that is sufficient to allow a reasonable finder of fact to find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual." *Id.* The Third Circuit Court of Appeals has "defined 'an adverse employment action' under Title VII as an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)). "It is important to note that although the burden of production may shift during the McDonnell Douglas inquiry, the ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the [employee] remains at all times with the [employee]." *Maldonado v. City of Allentown*, 803 F. Supp. 3d 329, 335 (E.D. Pa. 2025); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (explaining that once the plaintiff establishes a prima facie case, the law creates a "presumption" of unlawful discrimination, which is rebutted if the employer articulates a legitimate nondiscriminatory explanation for the employer's action, but the "presumption does not shift the burden of proof," and "the Title VII plaintiff at all times bears the ultimate burden of persuasion"), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 169-70 (2009).

Title VII again; the rest of the pleading is devoid of any Title VII allegations. *See* Third Am.

Compl. McCloud also alludes to instances of race discrimination. *See* Third Am. Compl. ¶ 56

("[McCloud] observed that if you were a Hispanic employee of Defendant as compared to an

African American employee, the Hispanic employee was given second and third chances."); *id.*

at ¶¶ 57-59 (recounting experiences of other African American employees); *id.* at ¶ 60 ("On

information and belief, McCloud asserts that other African American employees of Defendant

were terminated and subsequently either threatened with criminal prosecution or prosecuted

and/or never provided any meaningful opportunity to defend themselves."); *id.* at ¶ 61 (This

"pattern of actions . . . was executed by decision maker, policy maker Compliance

Officer/Director of Personnel Christina McDougal, who is white."). Yet, McCloud does not

assert that he was terminated or suffered an adverse action *because of* his race—nor does he

provide any facts in support of such an assertion. Lastly, McCloud mentions that he "is a

member of the class covered by the provisions of the Older Workers Benefit Protection Act of

1990. 29 U.S.C. § 626(f)" (a provision of the Age Discrimination in Employment Act, or

"ADEA"), *id.* at ¶ 64, and that Reading's "proposal" that he voluntarily resign "was and is

invalid under and violates the provisions of the Older Workers Benefits Protection Act. 29

U.S.C. § 626(f)," *id.* at ¶ 67. While this could be read as an attempt to plead age discrimination,

McCloud does not go so far as to allege supporting facts to show how or why his voluntary

resignation or termination was violative of the ADEA. Crucially, he does not allege that his role

was filled by someone sufficiently younger than himself.[27] There is no mention of age

discrimination anywhere else in the Third Amended Complaint.

---

[27]    *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) ("The elements of a *prima facie* case of age discrimination are that: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was

Thus, because McCloud provides no additional factual support for these cursory allegations, and fails to plead separate and clear causes of action under any of these theories of liability, any attempt to plead race or age discrimination, or any other disparate treatment claim under Title VII or related statutes, fails. To the extent McCloud sought to assert such claims (again) in his Third Amended Complaint, they are dismissed with prejudice. *See Alston*, 363 F.3d at 235.

## V.      CONCLUSION

McCloud has failed to allege municipal liability by Reading, as required to bring a claim under 42 U.S.C. § 1983. He has also failed to allege facts to support his claims for disability discrimination and retaliation. Since McCloud's Third Amended Complaint fails to amend the deficiencies in his earlier pleadings, the Court finds that additional leave to amend would be futile. Reading's Motion to Dismiss McCloud's Third Amended Complaint is granted, and the Third Amended Complaint will be dismissed with prejudice.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

---

ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive.") (citing *Burton v. Teleflex Inc.,* 707 F.3d 417, 426 (3d Cir. 2013)).